George C. SCHWAB, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17362.

United States Court of Appeals
Eighth Circuit.

Jan. 24, 1964.

———◆———

Torrey N. Foster, St. Louis, Mo., for appellant.

Patrick J. Foley, Asst. U. S. Atty., Minneapolis, Minn., Miles W. Lord, U. S. Atty., Minneapolis, Minn., for appellee.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

George C. Schwab, age 37, after a plea of not guilty, was convicted by a jury of a violation of the National Motor Vehicle Theft Act, 18 U.S.C. § 2312. The indictment charged him, in the statutory language, with having transported a truck in interstate commerce in September 1961 from Huron, South Dakota, to Virginia, Minnesota, "knowing the same to have been stolen". This court granted Schwab leave to prosecute his appeal in forma pauperis and ordered the transcript prepared at government expense. Schwab was represented at his trial by court appointed counsel. He is represented here by different counsel appointed by this court.

The defendant urges (a) the insufficiency of the evidence to support the conviction, (b) errors in the instructions, and (c) improper remarks as to the defendant's past criminal record.

There is not much dispute about the facts. On September 8, 1961, Schwab was employed with a carnival then at Huron, South Dakota. He temporarily occupied a boarding house room with an electric company lineman named Thomas Carter. Shortly after midnight on September 9 Schwab awakened Carter and asked to borrow his pickup truck. Carter granted this permission. Schwab took the keys and left with the truck. Carter testified that Schwab had told him he wanted to use the truck for one hour to move some merchandise and that he told Schwab he could use the truck if he would take care of it and get it back in an hour. Mary Ann Knudtson, who became 17 in October 1961, was also employed at the carnival. She knew the defendant as Johnny Deirk. She testified that she and Schwab had talked about leaving the carnival; that he told her that her boy friend was in the nearby village of Iroquois and that he would take her to him; that she waited for Schwab outside the boarding house early that morning; that he came out and said, "This is my truck" and "Let's go"; that they stopped a short while at a carnival party; that Schwab then drove the few miles east

to Iroquois where they looked around but did not find her friend; that after about ten minutes they continued east because "he was going to take me back to my home town" in Wisconsin; that Schwab paid for the gas along the way; that they drove through the Twin Cities; that Schwab said "he was going up to Virginia to visit some friends or relatives"; that they stopped, however, in St. Paul where Schwab said "he had a brother there who was a priest or something" and went in to talk to him; that they eventually reached Virginia, Minnesota; that they stayed in the truck that night; that Schwab looked around and said his relative was not there; that they went on to Ely, Minnesota, but found no one and started back to Virginia; that they again spent the night in the truck; and that as they were going to get gas a highway patrolman asked them to step out and Schwab said, "Well, we got caught, Mary". The patrolman testified that he gave his name as Frank Theisen.

In Ely Schwab saw Father Mihelcik from whom he sought to borrow money and to whom he gave the name of Theisen. In that city he dismantled a radio from the truck and gave it to a service station attendant as security for gasoline. When Schwab and Mary Ann were taken to jail in Virginia he was questioned by the assistant chief of police. That officer testified that Schwab told him that he had had no intention of taking Mary Ann to her boy friend and that he would have taken Carter's keys if he had been "asleep or not home".

Schwab took the stand in his own defense. He testified that he was concerned about Miss Knudtson's working at the carnival; that she was unhappy in that job and wanted to leave; that he had consumed a large amount of alcohol beginning September 7 and did not have any sleep; that he had received a call from a companion of Mary Ann's friend in Iroquois; that he tried to obtain accommodations for her; that he had told Carter that he might use the truck "a little while longer"; that he took none of his own possessions with him when he

left Huron and none of hers which he had had for three days; that he intended to leave Mary Ann with friends in Virginia; that when he was in Virginia he tried unsuccessfully to reach his Huron landlady by telephone; that he lost his wallet while fishing; that they did not try to conceal their whereabouts; that they used main highways; that when he was arrested he said the truck was borrowed and not stolen; and that he never attempted to dispose of the vehicle.

Appellate counsel for the defense observes that appropriate objections to the court's instructions and motions for judgment of acquittal or for a new trial may not have been made. The position is taken, however, that the errors now urged were plain and affected substantial rights, within the meaning of Rule 52(b), F.R.Cr.P. We look to the merits.

■ 1. The statute's use of the word "stolen". The argument here is that this necessarily embraces an intent permanently to deprive the owner of his vehicle and that the court's instruction which referred to "the intent to deprive the owner of the rights and benefits of ownership" was correct only insofar as it went and was erroneous because it stopped short of the required element of permanency.

Whatever may have been the early and varying approaches to the word "stolen" by the lower federal courts,[1] the matter was largely set at rest by the divided decision in United States v. Turley, 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed. 2d 430 (1957), where the Court said:

" 'Stolen' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny."

This court, of course, has recognized the efficacy of that holding and has followed it. Brown v. United States, 277 F.2d 201, 203 (8 Cir. 1960); Dixon v. United States, 295 F.2d 396, 399 (8 Cir. 1961); Landwehr v. United States, 304 F.2d 217, 220 (8 Cir. 1962). The defense asserts, however, that, although the quotation from Turley does not contain the word "permanently", this nevertheless is an essential aspect of the required intent and must be covered by the court's instructions. It refers to Turley's own illustrations, p. 416 of 352 U.S., p. 402, of 77 S.Ct., 1 L.Ed.2d 430 of automobiles purchased with a worthless check or rented "and sold" and it cites Boone v. United States, 235 F.2d 939, 940 (4 Cir. 1956) [otherwise noted with approval in Turley, 352 U.S. pp. 411–412, 77 S.Ct. pp. 399–400, 1 L.Ed.2d 430], where the Fourth Circuit, after construing § 2312 to cover the taking of a vehicle "for one's own use without right", added the comment "contemplating, of course, an intent to deprive the owner of it permanently".

We are not so persuaded. The decision in Turley has been uniformly recognized as a broad, not a narrow, approach to the statute. Its language which we have quoted does not say "all" the rights and benefits of ownership and it does not say that there must be an intent to deprive the owner of those rights for all time. The breadth of the Turley precedent demands a conclusion that the statute may be satisfied with something less than permanency and something less than a deprival of the totality of ownership.

Secondly, Boone concerned an automobile obtained, not through larceny, but by false pretenses, namely, purchasing it with a worthless check. It was in this connection and atmosphere that the "permanently" clause was employed by the Fourth Circuit. We cannot know, of

---

1. See, for example, Abraham v. United States, 15 F.2d 911, 912 (8 Cir. 1926) and Carpenter v. United States, 113 F.2d 692, 696 (8 Cir. 1940), where this court tested the word by the particular state's statutory definition of larceny, and Stew-

art v. United States, 151 F.2d 386, 388 (8 Cir. 1945) and Ackerson v. United States, 185 F.2d 485, 488 (8 Cir. 1950), where this court seems to have related it to common law larceny.

course, just why it was used. We think it was to emphasize the court's broad approach to the statute (the decision came down, after all, prior to the guidelines established by Turley) and to stress that something less than the intent of common law larceny was within the reach of the statute. We cannot believe that the Fourth Circuit, by its use of this phrase, appended to a quotation from other opinions, found in no prior decision, and essentially dictum, meant to restrict and circumscribe the statute. But if such a meaning was there, purposefully or by accident, we deem its force fully negated by the Turley decision.

Thirdly, although Boone has since been cited by the Fourth Circuit, Scott v. United States, 255 F.2d 18, 20 (4 Cir. 1958), cert. denied 357 U.S. 942, 78 S.Ct. 1392, 2 L.Ed.2d 1555; Miller v. United States, 261 F.2d 546, 547 (4 Cir. 1958); and United States v. Oates, 314 F.2d 593, 594 (4 Cir. 1963), and by the Fifth Circuit, Lyda v. United States, 279 F.2d 461, 464 (5 Cir. 1960), the "permanently" clause has not been quoted or approved in any of these opinions.

Finally, this very point, when it has been raised, has been decided adversely to the defense. In Berard v. United States, 309 F.2d 260, 261 (9 Cir. 1962), the court said, with respect to the permanency argument, "it would not suit the purposes of the Dyer Act to limit its application in the manner contended for by appellant". Judge Chesnut, in United States v. Sheffield, 161 F.Supp. 387, 389–391 (D.Md., 1958), and then Judge Jameson, in United States v. Brickles, 177 F. Supp. 944, 946–948 (D.Mont., 1959), dealt specifically with the phrase as it appeared in Boone. Although these two district court cases each concerned a situation where the defendant came into possession of the car without any authority whatsoever, the import of the opinions is clear. Judge Chesnut said, p. 390 of 161 F.Supp.:

"There can be no doubt that the original taking by the defendant in this case deprived the owner of important property rights and benefits. * * * Not only was the original taking within the ordinary acceptation of theft but the continued use of it by the defendant deprived the owner for several days of her rights and benefits of ownership."

And Judge Jameson observed by footnote that "There are many 'thefts' which do not include the requirement of an intent to deprive the owner permanently of his property", and said, pp. 947–48 of 177 F.Supp.:

"It is significant that in none of the other cases which have adopted the broader definition of the term 'stolen' has the court indicated that an intent to permanently deprive the owner of his property is an essential element of the crime. * * * I am convinced that while the defendants may not have formed a specific intent to permanently deprive the owner of his property, they did intend to deprive him of his property for so long as it suited their purposes."

We agree and we hold that the district court's instructions here were not erroneous because they failed to emphasize and require the element of permanency.

2. Sufficiency of the evidence. With this disposition of the first point the attack upon the sufficiency of the evidence has little substance. The defense argues that Schwab borrowed the truck with permission; that he was apprehended less than sixty hours later; that he had left his personal possessions in Huron; that he had made "every effort" to find a place for Miss Knudtson to stay; that there was no stealth in his actions and no attempt to conceal their whereabouts; and that he intended to return the truck.

This argument is largely for the jury rather than for us. Although initial possession of a vehicle, seemingly lawful due to the owner's consent, may perhaps complicate the proof for the prosecution, that fact by itself does not prevent the applicability of the statute. Convictions have been upheld where the automobile was rented, Brown v. United States, 283 F.2d 792 (8 Cir. 1960); Miller v. United

States, supra, 261 F.2d 546; United States v. Koeller, 310 F.2d 409 (7 Cir. 1962); Berard v. United States, supra, 309 F.2d 260; Jarvis v. United States, 312 F.2d 563 (9 Cir. 1963); Tandberg-Hanssen v. United States, 284 F.2d 331 (10 Cir. 1960); Gerber v. United States, 287 F.2d 523 (10 Cir. 1961); Sadler v. United States, 303 F.2d 664 (10 Cir. 1962), see United States v. Turley, supra, p. 416 of 352 U.S. p. 402 of 77 S.Ct., 1 L. Ed.2d 430, or was released to be driven across country, O'Dell v. United States, 251 F.2d 704 (10 Cir. 1058), or was released for demonstration, see Dixon v. United States, supra, 295 F.2d 396, or was borrowed, Compton v. United States, 305 F.2d 119 (9 Cir. 1962). In all these cases the necessary criminal intent, despite initial lawful possession, was found to be present.

■ The record contains testimony as to Schwab's telling Carter that he wished to borrow the truck for an hour to move some merchandise; Carter's granting of permission limited as to time and care of the truck; the defendant's use of aliases; Schwab's statement to police that if Carter had been asleep he would have taken the keys anyway; his assertion to the girl that the truck was his; the obviously lame excuse for the journey to Iroquois in the early hours of the morning; the continuing drive east; his awareness of the significance of crossing the state line; his statement that he would take the girl home to Wisconsin; the wandering and long interim journey northeastward to the Minnesota range; the two nights in the truck; the removal of the radio and its deposit as security for gasoline purchased, see Menter v. United States, 282 F.2d 143, 144 (5 Cir. 1960), and Gerber v. United States, supra, p. 524 of 287 F.2d; his statement on arrest that they had been caught; and the girl's

never knowing their real destination. All this, with the inferences fairly to be drawn therefrom, constitutes evidence of Schwab's intended continuous control of the vehicle beyond Carter's limited permission, of a representation of ownership, of an intent to take in any event, and even of an acknowledgment of guilt, and amply sustains the conviction.

■ 3. The instruction as to intoxication. The defense claims that the court erred in failing specifically to instruct the jury that if they found Schwab so intoxicated as to be incapable of forming a specific intent they must acquit. It stresses Schwab's own testimony that he had consumed a great amount of alcohol prior to the trip, other evidence of his drinking, and his statement that he had not had any sleep the night before. The court did comment upon the evidence, as to the drinking [2] but, as noted, the defense wants a specific instruction. It cites as supporting authority Edwards v. United States, 84 U.S.App.D.C. 310, 172 F.2d 884 (1949) and Allen v. United States, 239 F.2d 172 (6 Cir. 1956).

There is no merit to this point. The court's comments to the jury correctly describe the contention made by the defense at the trial. The situations in Edwards and Allen are obviously distinguishable. The vice in the instructions in those cases was very different from what is at issue here. Of course, acquittal is in order if a jury entertains a reasonable doubt as to whether the defendant was capable of the requisite intent. This issue, however, was fairly presented to the jury, in the light of the evidence submitted, by the court's comments directed toward drinking plus weariness. Heideman v. United States, 104 U.S.App. D.C. 128, 259 F.2d 943, 946–947 (D.C. Cir. 1958), cert. denied 359 U.S. 959, **79** S.Ct. 800, 3 L.Ed.2d 767.

---

2. "I don't understand that Schwab contends that he was drunk and didn't know what he was doing. I understand that he contends he had been drinking and that he had loss of sleep and was tired, and that that has a bearing upon his intent. He contends that he was so befogged by drinking and lack of sleep and that he had no intent to do anything wrong; in other words, that he didn't have the criminal intent to deprive Carter of the use and benefits of this car. I think that is a fair analysis of the position he attempts to state here in court."

4. Remarks as to past convictions. Schwab took the stand. On cross-examination he gave affirmative answers to questions whether he had more than once been convicted of a felony. He then admitted four such convictions. In the course of this interrogation the prosecution asked about two others. He denied these.[3] The government did not follow through with proof of the two.

The defense argues that the questioning about the two unproved convictions was improper; that it served to deny the defendant a fair trial; that it could not be cured by a precautionary instruction; and that the court failed to give a precautionary instruction anyway.[4] It suggests, too, that insinuations and innuendos may be imparted by inflections of the voice. In essence the defense position is that the government, when it attacks a defendant's credibility, inquires as to an unproved past conviction at its peril.

This, of course, is a sensitive area. The defense does not deny that the government may attempt to impeach a defendant's credibility "by his past criminal record", that is, by past conviction, at trial or by plea of guilty, of a felony, an infamous crime or a crime involving moral turpitude. Christianson v. United States, 226 F.2d 646, 655 (8 Cir. 1955), cert. denied 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859; Pittman v. United States, 42 F.2d 793, 795 (8 Cir. 1930); see Humphries v. United States, 310 F.2d 377 (8 Cir. 1962); Michelson v. United States, 335 U.S. 469, 482 (1948). What is forbidden is essential unfairness as, for example, an attempt to show merely an arrest or an accusation of misconduct, Glover v. United States, 147 F. 426, 429–430 (8 Cir. 1906); Echert v. United States, 188 F.2d 336, 343 (8 Cir. 1951), Homan v. United States, 279 F.2d 767, 771 (8 Cir. 1960), cert. denied 364 U.S.

---

3. "Q. Have you ever been convicted of a felony? * * *

"The Witness: Yes.

"Q. More than once?

"A. I believe so, yes.

"Q. When was the last time you were convicted of a felony?

"A. I don't remember the date.

"Q. Well, could it have been at Fort Smith, Arkansas, on March 30, 1959, for transportation of a stolen motor vehicle in inter-state commerce?

"A. I was not charged as such at that time. I was charged as an accessory.

"Q. Nevertheless, it was for transporting a stolen motor vehicle across the state line?

"A. This appeared on the commitment, yes.

"Q. You were convicted?

"A. By a jury, yes.

"Q. When was the next felony conviction prior to that?

"A. I have no idea.

"Q. Well, could it have been at Denver, Colorado, in July of 1956 for impersonating a police officer?

"A. I was exonerated.

"Q. You were not convicted of that?

"A. No, I wasn't.

"Q. How about February 19, 1957, larceny by bailee?

"A. Yes.

"Q. You were convicted of that?

"A. Yes, I was.

"Q. That was in Cannon City, Colorado, was it not?

"A. Yes.

"Q. Prior to that, on October 19, 1950, in the same city, were you convicted for forgery?

"A. I was convicted for uttering, not forgery.

"Q. For uttering a false instrument?

"A. I was convicted in passing one check.

"Q. In Rawlins, Wyoming, November 8, 1944, you were convicted of embezzlement?

"A. Yes, I was.

"Q. I believe in Cody, Wyoming, May 16, 1941, were you convicted of burglary?

"A. No, I was not. I was incarcerated because I had run away from home, and was held until my parents came and got me. There were no charges.

"Q. All right. * * *"

4. The court did say:

"Now, the testimony shows that he has been convicted of several crimes. Well, the only purpose of that testimony is insofar as it may tend to bear upon the weight that you want to give to Schwab's testimony. The mere fact he has a criminal record, of course, doesn't make him guilty of this offense, and the testimony regarding his prior convictions may be considered by you only insofar as it bears upon the weight you want to attach to his testimony, the credibility of his testimony, and it is limited to that purpose."

866, 81 S.Ct. 110, 5 L.Ed.2d 88; Rizzo v. United States, 304 F.2d 810, 831 (8 Cir. 1962), or an inquiry when the prosecutor knew or should have known that there was no conviction, Pearson v. United States, 192 F.2d 681, 697–699 (6 Cir. 1951), or persistence of inquiry after a definite negative answer, United States v. Tomaiolo, 249 F.2d 683, 687 (2 Cir. 1957); United States v. Nettl, 121 F.2d 927, 930 (3 Cir. 1941).

■ We are fully satisfied, under all the circumstances here, that no improper prejudice to the defendant could possibly have resulted from the prosecution's questioning. Four felony convictions were definitely, although somewhat reluctantly, admitted. The two now challenged were interspersed among these four. As to one, no further question followed. As to the other, the ensuing "You were not convicted of that?" probably helped rather than hindered the defense for it emphasized lack of guilt and explained for the jury the not too common word "exonerated" in the defendant's preceding answer. The questions were aimed at material which at worst was nothing more than cumulative. Wiley v. United States, 257 F.2d 900, 906 (8 Cir. 1958). There is no intimation of bad faith on the part of the prosecution. Davis v. United States, 229 F.2d 181, 186 (8 Cir. 1956), cert. denied 351 U.S. 904, 76 S.Ct. 706, 100 L.Ed. 1441; Salerno v. United States, 61 F.2d 419, 424 (8 Cir. 1932). There was no suggestion to the court of impropriety. The judge himself obviously was not cognizant of anything unfair. This defendant is not free of past crime.

His adroit testimony shows he is not dull or ignorant. He has a substantial list of admitted felony convictions. Bringing these out constituted a vigorous, allowable and, no doubt, telling attack on his credibility. The additional inquiries certainly added nothing by way of dramatic adverse impact. We are able to say with conviction that they did not sway or influence this jury and we ignore reality if we were to hold that the supplemental questions constituted reversible error.

■ 5. The instructions as to the girl. In his opening statement government counsel said that the evidence would show that Schwab had sexual relations with Miss Knudtson on one of the nights they spent in the truck. On direct examination the girl, after stating she slept in the vehicle, was asked whether "anything else" happened. The court interrupted to say, "Perhaps we should save her from that embarrassment, if it is anything embarrassing. Let's omit that". Nothing further as to this came out in the testimony other than the defendant's own statement on direct examination that he was otherwise charged with "white slavery, debauchery and the Mann Act". In his instructions the court referred to the girl's presence on the journey.[5]

The defense argues that the effect of the court's comments left the impression that the defendant was immoral and depraved and that the comments were unfair when there was no evidence to support them.

Intent, of course, was pertinent. But what this point comes down to is that,

---

5. "Do you think, in light of the evidence, that he in good faith intended to have this girl lodged with his ex-wife, or do you think that he had some other mission in mind in transporting this girl? Of course, we are not concerned with whatever he may have done with this girl. In other words, he may have been indiscreet. He may have done things that one might frown upon. He isn't charged with transporting a woman for any immoral purpose or anything of that kind, but his relations with the girl and what he did with her may throw light on his intent with reference to this car. * * * " * * * Did he attempt in good faith to find a place for this girl? Why didn't he take her to her home in Wisconsin where she wanted to go? The fact that he didn't take her to Wisconsin and went to Virginia, standing alone, doesn't make him guilty of any offense. He is not charged with abducting the girl, but those facts and circumstances may have a bearing, and you should give them such weight as you believe they are entitled to in order to determine what his intent was."

although the trial judge was endeavoring to afford some protection to a teenager in open trial as to a matter of morality, the court is now being criticized for so doing. We deem the instruction appropriate under the circumstances and not prejudicial.

In summary, we state that we have carefully reviewed the entire transcript and, in particular, the court's instructions. There is no error in this record but if, conceivably, there might be, it was not prejudicial. This case is another one which reminds us all that a defendant is entitled only to a fair trial but not to a perfect one. Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); Brown v. United States, supra, p. 798 of 283 F.2d.

We are indebted to Mr. Torrey N. Foster of the Saint Louis Bar, court appointed appellate counsel for the defendant. He has most adequate and vigorously presented all aspects of the defendant's case.

Affirmed.