# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2474

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| James Norman Van Elsen, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 17, 2011
Filed: August 31, 2011

_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

James Norman Van Elsen stands convicted for the theft or embezzlement of funds from his employee's Individualized Retirement Accounts (IRA), in violation of 18 U.S.C. § 664. On appeal, Van Elsen argues that his conviction should be reversed because, at trial, the district court[1] barred him from presenting evidence to the jury that he eventually repaid all of the embezzled funds. We affirm.

_____

[1]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

## I. *Background*

Van Elsen solely owned Van Elsen Consulting, Inc. (VEC), a small actuarial business that serviced insurance companies. In September 2002, Van Elsen established a "Simple IRA" for his employees' benefit. A Simple IRA, similar to a 401(k) retirement plan, enables employees to save for retirement by authorizing their employer to withhold from their paycheck pretax dollars in predetermined amounts and deposit the funds into the employees' Simple IRAs. When Van Elsen established the Simple IRA, his retained plan administrator, American Funds, advised Van Elsen of his legal obligation to deposit withheld money into an employee's Simple IRA as soon as the money could be reasonably segregated from VEC's general assets but not later than 30 days after the last day of the month in which the monies were withheld.

In the fall or winter of 2004, Van Elsen began working on plans to start his own life insurance company, "Pella RE." Van Elsen testified that, during this period, he largely delegated the direction of VEC's day-to-day operations to VEC employees, and focused the majority of his time on starting Pella RE.

In 2005 and 2006, Van Elsen withheld retirement money from the paychecks of three employees, Michael Staudacher, Mark Rowley, and Terry Hilker, but Van Elsen failed to deposit any withheld money into the employees' Simple IRAs within the statutory period. On several occasions in 2005 and 2006, Van Elsen admitted to the employees—both orally and via email—that he failed to timely deposit the withheld monies but assured repayment as soon as possible. For example, in a February 2005 email, Van Elsen reassured the three employees that "I know, I am behind in the IRA payments . . . . No one should worry, all monies will be deposited."

In late summer 2005, the Department of Labor ("Labor Department") received a complaint from one of VEC's former employees concerning Van Elsen's failure to deposit Simple IRA withholdings for the year 2004. In response to the Labor Department's subsequent inquiry into the matter, Van Elsen assured the Labor

Department representative that this failure was an isolated mistake but failed to mention that the Simple IRA deposits for 2005 were also in arrears. Moreover, Van Elsen also withdrew more than $213,000 from VEC's company bank account to pay his own personal mortgage, make department store purchases, and finance personal trips. In June 2005, Van Elsen used approximately $10,000 from the company's account to purchase a boat.

In June 2006, an Internal Revenue Service (IRS) agent contacted Van Elsen about delinquent payroll taxes, and, according to Van Elsen, instructed him "not to make any unnecessary payments to anyone other than the IRS until a repayment plan could be established for his debts to the IRS." At trial, Van Elsen testified that the IRS agent instructed him to pay over to the IRS the Simple IRA monies that he withheld from his employees' paychecks. The IRS Agent countered this claim with her own trial testimony that, never in her 23 years with the IRS, had she advised a taxpayer to take such action. Presently, on appeal, Van Elsen avers in his brief that, "[a]s [he] understood it, payments to the employees' retirement accounts were 'unnecessary' according to the IRS."

In the fall of 2006, the Labor Department again received a complaint about Van Elsen's failure to pay into the Simple IRA, prompting one of its investigators to contact Van Elsen. Van Elsen conceded that he failed to timely deposit employees' withholdings into their Simple IRAs but attributed this failure to ongoing financial difficulties that the company was experiencing. Van Elsen did not claim to the Labor Department, as he did at trial, that the IRS had advised him earlier that year to abstain from depositing money into the Simple IRAs until he paid his tax arrears. Moreover, despite draining $213,000 from the company's accounts for personal expenditures, Van Elsen told the Labor Department investigator that he had not drawn a salary in 2005 or 2006 as a self-imposed austerity measure. At trial, Van Elsen testified that, notwithstanding the seemingly personal use to which it was put, the $213,000 in withdrawals was not "salary" or "income."

-3-

In September 2006, just before Van Elsen received his second Labor Department complaint, the IRS placed a $17,000 levy on one of VEC's company accounts. In October 2006, the IRS levied VEC's accounts receivable. On December 31, 2006, Van Elsen closed VEC. In April of 2008, Van Elsen and his wife filed for protection under Chapter 11 of the Bankruptcy Code. On January 14, 2010, Van Elsen repaid the Simple IRA deposits to the Labor Department by depositing all past-due monies plus interest into his employees' accounts pursuant to his Chapter 11 reorganization plan. Van Elsen's repayment occurred approximately six years after they were due, nearly seven months after his indictment and just two weeks before trial.

At trial, Van Elsen sought to introduce evidence of his attempts to start Pella RE, certain medical ailments from which he suffered, his allegedly unwavering intent to repay the withheld Simple IRA money, and his actual repayment. The government filed a motion *in limine* to bar Van Elsen from introducing any such evidence.

Ultimately, the district court permitted Van Elsen to introduce evidence of his attempts to found Pella RE, his ailments, and his intent to repay the Simple IRA withholdings. However, the district court concluded that evidence of Van Elsen's actual repayment on the eve of trial is irrelevant. The district court first entertained Van Elsen's argument at a pretrial conference, just before *voir dire*:

> MR. LOCHNER [att'y for the gov't]: There was just one thing. The defendant did finally make a payment about two weeks ago of what he owes these employees. I filed that as to exclude that evidence as being irrelevant because it was so far after the crime was either committed or not committed, but at least on that one I would like a limiting instruction to explain to the jury that—
>
> THE COURT: I just think it's irrelevant. Yeah.

* * *

MR. APPLEBY [Att'y for Van Elsen]:  I had intended to ask him about that.

* * *

THE COURT:  Well, why don't you make an offer of proof and then if I think it has something to do with intent, I'll let it in.

It's difficult. It seems to me if we did that in every case where the Government claimed a late payment there would be very few prosecutions. I'm thinking of tax, ERISA, et cetera. So my sense is it's irrelevant, but maybe I'm missing something, which is always easy for me to do.

MR. APPLEBY:  Well, Judge, I'm thinking of—

THE COURT:  Yeah.

MR. APPLEBY:  —if I'm a juror, it makes a lot of difference to me with intent, seeing if he wanted to defraud the plan, if he actually paid it. If he paid it, there's certainly a sense that there was no intention to defraud.

THE COURT:  But it does seem to me that the statute would be meaningless, wouldn't it? I mean, every time the Government would indict me for nonpayment of taxes, if I come in the day before trial and pay up—I mean, that's kind of my common sense thinking about it, but you know, maybe—I guess your claim is it goes to intent?

MR. APPLEBY:  That's my claim, Judge, yes.

THE COURT:  Okay. Well, let me think about it.

Subsequently, the case proceeded to trial, and, after the government rested and just before putting on his own evidence, Van Elsen made his final proffer as to the

-5-

evidence of his repayment and the district court concluded that such evidence was inadmissible due to its irrelevance:

> MR. APPLEBY: . . . If it please the Court, Your Honor, I'd offer proof that Mr. Van Elsen was civilly sued by the Department of Labor to recover these unpaid employee contributions to the SIMPLE IRA plus additional interest they call opportunity costs; that through that process he agreed to pay and he has, indeed, paid the entire amount and that suit has been satisfied and settled.
>
> He went through bankruptcy and entered into a stipulation with the Department of Labor there to make that payment, so the civil suit was a direct result of that. Those payments have all been made.
>
> THE COURT: Okay. And, counsel, I think my ruling, this goes to the Government's motion in limine, was based upon [sic] I didn't believe that that had anything to do with their intent—with his intent, pardon me, in '05 and '06.
>
> Your argument is this does have something to do with intent, I take it?
>
> MR. APPLEBY: Yes, Your Honor. That's the argument.

The jury convicted Van Elsen of theft or embezzlement from an employee benefit plan in violation of 18 U.S.C. § 664, and the district court subsequently sentenced him to 15 months' imprisonment. On appeal, Van Elsen maintains that the district court erred when it precluded him from presenting evidence of his eventual repayment.

## II. *Discussion*

"We review a district court's evidentiary rulings . . . for abuse of discretion, according substantial deference to the district court's rulings." *United States v. Ferguson*, 484 F.3d 1068, 1074 (8th Cir. 2007). "Even when an evidentiary ruling is

improper, we will reverse a conviction on this basis only when the ruling affected substantial rights or had more than a slight influence on the verdict." *United States v. Haas*, 623 F.3d 1214, 1219 (8th Cir. 2010) (quotation and citation omitted). The district court did not abuse its discretion in precluding Van Elsen from presenting evidence of repayment because such evidence is irrelevant to the *mens rea* that 18 U.S.C. § 664 proscribes. Van Elsen's repayment, even if he genuinely intended to repay, did not negate the illegality of his misuse of employees' Simple IRA withholdings for his personal prerogatives. Such defalcation, regardless of its purportedly temporary duration, constituted an offense punishable under 18 U.S.C. § 664.

Title 18, United States Code, Section 664, Van Elsen's statute of conviction, imposes criminal liability on

> [a]ny person who *embezzles*, *steals*, or unlawfully and willfully *abstracts* or *converts* to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith.

(Emphases added.) Section 664 plainly criminalizes four types of theft—embezzlement, stealing, abstraction, and conversion—each of which is separated with the disjunctive conjunction, "or." In other words, Van Elsen could violate § 664 if he embezzles or steals or unlawfully and willfully abstracts or unlawfully and willfully converts funds from his or her employees' Simple IRAs. Neither we nor the Supreme Court have directly addressed the specific intent, if any, required for any of these offense terms found in § 664. However, the Supreme Court and this circuit have interpreted these terms in other contexts because Congress has employed them in other, similarly worded statutes. Both courts have concluded that at least two of the four acts—stealing and willful conversion—do not require proof of a defendant's specific intent to permanently deprive.

For instance, in *Morissette v. United States*, the Supreme Court construed 18 U.S.C. § 641—a statute prohibiting the theft of public money, property, or records. 342 U.S. 246 (1952). Notably, § 641 is situated at the beginning of United States Code Chapter 31, where § 664 also resides. Worded similarly to § 664, § 641 imposes criminal liability on "[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another" any United States government property. 18 U.S.C. § 641. In *Morissette*, the named defendant was convicted under § 641 for venturing onto an abandoned Air Force bombing range during a hunting trip and salvaging what he believed to be discarded bomb materials, which he subsequently had pressed into scrap metal and sold. 342 U.S. at 247. Despite Morissette's persistent contention that "he believed the casings were cast-off and abandoned, that he did not intend to steal the property, and took it with no wrongful or criminal intent," the trial court instructed the jury that "[t]hat is no defense." *Id.* at 248–49. Although the Supreme Court ultimately "read into the statute" a general intent requirement and thus overturned Morissette's conviction, it did so based on the rationale that,

> Congressional silence *as to mental elements* in an Act merely adopting into federal statutory law a concept of crime already so well defined in common law and statutory interpretation by the states may warrant quite contrary inferences than the same silence in creating an offense new to general law, for whose definition the courts have no guidance except the Act.

*Id.* at 262 (emphasis added).

Accordingly, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Id.* at 263. "In such a case," the Supreme Court reasoned, "absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Id.* In concluding that common law traditionally applied a *general*-intent *mens rea* to

theft offenses, the *Morissette* Court, in *dicta*, contrasted "stealing" with "knowing conversion," both of which § 664 (Van Elsen's statute of conviction) criminalizes:

> Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. To steal means to *take away from one* in lawful possession without right with the *intention to keep wrongfully*. Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact.

*Id.* at 271–72 (internal quotation and citation omitted). Thus, in this *dicta* in *Morissette*, the Supreme Court construed "conversion," as it is used in a provision which shares space with § 664 in Chapter 31 of the United States Code, to be closer to a misappropriation or an embezzlement than a common law larceny in that it does not necessitate proof of an accused's intent to permanently deprive the victim of his or her property. Notably, in *United States v. Rehak*, we relied on this very *dicta* from *Morissette* to conclude that "[s]ection 641 prohibits both permanent and temporary takings." 589 F.3d 965, 973 (8th Cir. 2009).

Just five years after *Morissette*, the Supreme Court decided *United States v. Turley*, 352 U.S. 407 (1957) in which it construed 18 U.S.C. § 2312, commonly called the "Dyer Act." 352 U.S. 408 (1957). At the time, that provision punished "[w]hoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been *stolen*." National Motor Vehicle Theft Act, ch. 645, 62 Stat. 806 (1948) (current version at 18 U.S.C. § 2312 (2006)) (emphasis added). In that case, the issue before the Supreme Court was "whether the meaning of the word 'stolen,' as used in this provision, is limited to a taking which amounts to common-law larceny,

or whether it includes an embezzlement or other felonious taking with intent to deprive the owner of the rights and benefits of ownership." *Turley*, 352 U.S. at 408.

In other words, the Supreme Court in *Turley* squarely addressed, in the context of the Dyer Act, the scope of conduct implicated by the word "stolen." In *Turley*, the Supreme Court reiterated its rule of statutory construction from *Morissette* that, "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *Turley*, 352 U.S. at 411. Nevertheless, despite the narrow, larcenous meaning it ascribed "stolen" and "stealing" in *Morissette*,[2] the Supreme Court stated in *Turley*, that "'stolen' and 'steal' have been used in federal criminal statues, and the courts interpreting those words have declared that they do not have a necessary common-law meaning coterminous with larceny and exclusive of other theft crimes." *Id.* at 412. Instead, relying largely on the Dyer Act's legislative history in which "Congress used the word 'stolen' as synonymous with 'theft,' a term generally considered to be broader than 'common-law larceny,'" *id.* at 414, the *Turley* court "conclude[d] that the Act requires an interpretation of 'stolen' which does not limit it to situations which at common law would be considered larceny," *id.* at 417.

Since *Turley*, this court has adopted *Turley*'s broad definition of "stolen" and applied it to the Dyer Act as well as other federal criminal statutes. In *Schwab v. United States*, for example, this court rejected the defendant's argument that the Dyer Act's use of the word "stolen" compelled proof of a specific intent to permanently deprive, noting that *Turley* foreclosed this argument. 327 F.2d 11, 13 (8th Cir. 1964). Then-Circuit Judge Blackmun went on to "agree" with the following definition of "stolen," which he did not explicitly restrict to the Dyer Act context:

---

[2]*See supra* Part II ("To steal means to *take away from one* in lawful possession without right with the *intention to keep wrongfully*.") (quoting *Morissette*, 342 U.S. at 262).

"It is significant that in none of the other cases which have adopted the broader definition of the term 'stolen' has the court indicated that an intent to permanently deprive the owner of his property is an essential element of the crime. . . . I am convinced that while the defendants may not have formed a specific intent to permanently deprive the owner of his property, they did intend to deprive him of his property for so long as it suited their purposes."

*Id.* at 14 (quoting *United States v. Brickles*, 177 F. Supp. 944, 947–48 (D. Mont. 1959)). Similarly, in *United States v. Johnson*, 575 F.2d 678 (8th Cir. 1978), this court construed 18 U.S.C. § 2113(b) which precludes "stealing" or "purloining" of money from a bank. The court stated in *dicta* that "[t]he foregoing discussion [involving *Turley*] suggests that the terms 'steal or purloin,' as used in 18 U.S.C. § 2113(b), are not limited to conduct included in common law larceny" and thus "entertain[ed] some doubt about the validity of Mr. Johnson's position" to the contrary. *Id.* at 680.

The Supreme Court and this circuit broadly construe Congress's use in a federal theft statute of the word "conversion," and more especially, the word "steal." Unless Congress states otherwise, we do not discern, through Congress's deployment of those words, a Congressional intent to proscribe only larcenous thefts infused with the malefactor's intent to permanently deprive the victim of his or her property. Moreover, we find persuasive that at least two of our sister circuits have construed § 664 to not require proof of such an intent to permanently deprive. *See United States v. Walker*, 234 F.3d 780, 783 (1st Cir. 2000) ("[T]he crime of embezzlement does not include as an element an intent to permanently deprive the victim of the funds, but rather a temporary deprivation will do . . . ."); *United States v. Wuagneux*, 683 F.2d 1343, 1359 (11th Cir. 1982) (holding that evidence was sufficient to support guilty verdict under § 664 where defendant procured loan from a pension fund based on grossly overvalued collateral even though defendant was indicted prior to loan's maturity, reasoning that "the loan was in default at the time of trial" (citing *United States v. Waronek*, 582 F.2d 1158, 1161 (7th Cir. 1978) for the proposition that "intent to

permanently deprive owner of property [is] not an element of embezzlement," and *United States v. Daley*, 454 F.2d 505, 510 (1st Cir. 1972) for the proposition that "possibility of future recovery of funds does not preclude criminal liability")).

Van Elsen relies principally upon *United States v. American Grain & Related Industries*, to buttress his argument that repayment of converted or embezzled property is relevant to intent in a conversion or embezzlement prosecution. In *American Grain*, the Des Moines-based defendants operated wheat silos in Houston and Fort Worth, Texas. 763 F.2d 312, 316 (8th Cir. 1985). After a "blending error" at the Houston facility, which resulted in the spoilage of wheat slated for shipment, a company vice president ordered the transfer of grain from the Fort Worth facility to cover the pending Houston order. *Id.* However, other employees informed the vice president that this measure would likely deplete the Fort Worth facility's wheat below the minimum level required by federal licensing regulations, which mandated that facilities keep a certain amount of wheat on hand. *Id.* Believing this estimate to be in error, the vice president ordered the shipment anyway and promised to replace the grain if unacceptable depletion occurred. *Id.* Upon learning that the vice president had in fact depleted the Fort Worth facility's grain below the regulatory minimum, the company replaced the Fort Worth wheat and disclosed the mishap to the government. *Id.* at 318. In the resulting prosecution, the company was charged with conspiring "to remove, dispose of, and convert grain owned by or pledged to the Commodity Credit Corporation (CCC), an agency of the federal government, in violation of 15 U.S.C. § 714m(d)." *Id.* at 315. The district court refused to instruct the jury that the company's intent to replace the Fort Worth wheat was a defense to willful conversion, or that it was even relevant to intent. *Id.* at 320. On appeal, this court reversed. *Id.* Specifically, although this court affirmed a portion of the jury charge instructing that "intent to replace the grain is not a defense to a willful conversion," it clarified that "the jury also should have been instructed that efforts to replace the grain are relevant to whether appellants had the intent necessary to commit a willful conversion of CCC grain at the time it was shipped to Houston." *Id.*

*American Grain* is distinguishable from Van Elsen's case for several reasons. First, it is undisputed that Van Elsen was permitted to present evidence at his trial that he always intended to repay the withheld funds. Second, *American Grain* limited its analysis to conversion, whereas Van Elsen's statute of conviction, 18 U.S.C. § 664, additionally criminalizes "stealing," which does not seem to require proof of an intent to permanently deprive. Third, *American Grain* is factually distinguishable because the defendants in that case repaid the wheat approximately a week after its conversion, and, as the *American Grain* court made clear, the repayment was relevant only insofar as it bore on the inquiry of "whether appellants had the intent necessary to commit a willful conversion of CCC grain *at the time it was shipped to Houston*." 763 F.2d at 320 (emphasis added). In contrast, Van Elsen did not repay his employees until years after embezzling their funds and did so as a condition of his bankruptcy discharge. Fourth, and finally, in the 30-plus years since *American Grain*, this court has never cited it as support for Van Elsen's proposition that an intent to repay is either a defense or otherwise relevant to a prosecution under any federal criminal law for embezzlement, "stealing," or even conversion.

In conclusion, because the intent to permanently deprive is neither a required element of, nor a defense to, the "conver[sion]" or "steal[ing]" that 18 U.S.C. § 664 criminalizes, the district court did not abuse its discretion when it excluded evidence of Van Elsen's eventual repayment of his employees' funds in a bankruptcy proceeding as irrelevant. *See* Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."); Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." (emphasis added)).

## III. *Conclusion*

Based on the foregoing, we affirm.

_____