UNITED STATES of America, Appellee,

v.

Joseph Gale MAY, Appellant.

No. 79–1790.

United States Court of Appeals,
Eighth Circuit.

Submitted April 16, 1980.

Decided May 30, 1980.

Rehearing and Rehearing En Banc
Denied June 25, 1980.

Robert E. Dreher, Dreher, Wilson, Adams, Jensen (on brief), Sayre & Gribble, Des Moines, Iowa, for appellant; Rosenberg & Margulies, Des Moines, Iowa, on brief.

Roxanne Barton Conlin, U. S. Atty., Des Moines, Iowa, for appellee.

Before HEANEY and ARNOLD, Circuit Judges, and WRIGHT,* District Judge.

HEANEY, Circuit Judge.

Joseph Gale May, former Adjutant General of the Iowa National Guard, appeals from his conviction on fifteen counts of an eighteen-count indictment.[1] We hold that the trial court erred in not instructing the jury that May could only be convicted for using military aircraft for his personal use if the jury found that his use seriously violated the government's right to control the use of the aircraft. We thus reverse May's conviction on the eleven counts dealing with the unauthorized use of military aircraft. May was properly convicted, however, on each of four other counts.

The allegations of the indictment against General May fall into two groups: (1) that he directed a series of unauthorized flights, using National Guard aircraft, fuel and personnel, that served his own convenience

---

\* The Honorable SCOTT O. WRIGHT, United States District Judge for the Western District of Missouri, sitting by designation.

1. Prior to submission of the case to the jury, the court directed a verdict in May's favor on two counts (Counts 14 and 15). The jury acquitted May on Count 10.

rather than that of the National Guard (Counts 1–12); and (2) that he made false statements and claims about these flights and tried to conceal records of them (Counts 12–18). The evidence showed that General May, who was a passenger on the questioned flights, had a nonbusiness purpose in arranging them. On all but one occasion, May directed the flights to destinations allowing him to visit his fiance, Ms. Gwen Applequist. Seven of the flights for which General May was convicted delivered him to and/or returned him from airfields in Florida, the former home state of Ms. Applequist; one flight was made to visit her in New Orleans; two others enabled May to be with her when she attended a conference in Chicago; and a final flight enabled May to spend Thanksgiving weekend with other friends in Las Vegas, Nevada. As a result of these flights, General May was charged with embezzlement and conversion of government property in violation of 18 U.S.C. § 641.

The other counts of which May was convicted alleged that he made false statements in violation of 18 U.S.C. § 1001, attempted to cause records to be concealed in violation of 18 U.S.C. § 2071, and submitted a false claim for payment in violation of 18 U.S.C. § 287.

May was fined $5,000 and given fifteen concurrent one-year sentences. He was to be released as if on parole after service of one-third of the sentence term.

## I. THE FLIGHT COUNTS

May's threshold contention is that the conduct alleged in the flight counts is not punishable as a crime. He argues that 31 U.S.C. § 638a(c)(2) provides an administrative remedy for the willful misuse by government personnel of any government-owned motor vehicles or aircraft and, therefore, precludes the application of a criminal statute to the same conduct. He further suggests that the failure of the revisors and codifiers of Title 18 to include the conduct specifically addressed in section 638a(c)(2) reflects a legislative determination that this conduct is not a crime.

We find this argument unpersuasive. First, section 638a provides an administrative remedy against officers and employees of the federal government. Because General May was an employee of the State of Iowa with limited responsibilities of a federal nature, section 638a arguably does not apply to him and, thus, there is no overlap of administrative and criminal sanctions. Second, May's argument concerning the legislative history of section 641 misses the mark. The task of the revisors and codifiers of Title 18 was to collect, coordinate and simplify existing criminal laws. They were not charged with evaluating existing administrative sanctions to see if they should be elevated to criminal status or with reconciling overlapping administrative and criminal remedies. *See generally* Legislative History [of Title 18], reprinted in U.S.C.A. (1969) following Title 18.

May also contends that his conviction on the flight counts must fall because both the indictment and the jury instructions failed to mention specific intent. There is no doubt that specific intent is a required element of an offense under section 641. *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). May's suggestions, however, that specific intent was neither charged in the indictment nor submitted to the jury are in error.

Each of the flight counts alleged that May "did *willfully* and *knowingly* embezzle and convert to his own use property and other things of value of the United States * * *." (Emphasis added.) May argues that the indictment should have contained the additional allegation that he acted "unlawfully," citing *Morissette* and *United States v. Denmon*, 483 F.2d 1093 (8th Cir. 1973), for support. In *Morissette,* the Supreme Court discussed with approval an indictment which charged the defendant with "unlawfully, willfully and knowingly" stealing and converting, and made it clear that had the indictment been limited to the words of the statute (to "steal" and "knowingly convert"), it would have been defective for failing to set forth a necessary

element of the crime. 342 U.S. at 270 & n.30, 72 S.Ct. at 253 & n.30. In *Denmon*, we reversed a conviction on an indictment which carried no allegation of specific intent stating that "the failure of the indictment to charge that the defendant acted knowingly, unlawfully, and willfully is fatally defective to the Government's prosecution of this indictment." 483 F.2d at 1095.

The point of both *Morissette* and *Denmon*, however, is that specific intent is a necessary element that must be alleged in the indictment; neither case required a particular verbal formula. In our view, the addition of the word "willfully" to the statutory language of "knowingly" is sufficient to convey the allegation that the defendant acted with specific intent. *See O'Malley v. United States*, 378 F.2d 401, 404 (1st Cir.), *cert. denied*, 389 U.S. 1008, 88 S.Ct. 571, 19 L.Ed.2d 606 (1967) ("The words 'willfully and knowingly' amply convey the necessary element of mens rea.").

■ May also contends that the requirement of specific intent was not explained to the jury. Instruction 10, however, clearly and properly put the issue before the jury.[2] *See id.* at 404 n.3.

More serious is May's argument that he was tried on a theory of conversion so novel and expansive as to be beyond the purview of section 641. Specifically, he alleges that the district court erred in holding that the *use* of property, as opposed to the property itself, is subject to conversion under the statute. He also contends that the district court erred in instructing the jury on the standard by which conversion is to be judged.

Title 18 U.S.C. § 641 applies to:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another * * * any record, voucher, money or thing of value of the United States * * *.

The first prong of May's argument is that the government has impermissibly expanded the statutory concept of conversion.

■ At common law, only chattels or tangible property were subject to the tort of conversion. *See* Restatement (Second) of Torts § 222A (1965). In modern tort law, this rule has been relaxed somewhat in favor of the "reasonable proposition that any intangible generally protected as personal property may be the subject * * * [of] conversion." *Pearson v. Dodd*, 410 F.2d 701, 707 n.34 (D.C. Cir.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). The question at issue here is whether section 641 applies only to conduct involving property which would be the subject of traditional tort law analysis or whether the statutory phrase "money or other thing of value" broadened the application of the statute to conduct involving different types of valuables.

■ May argues that the only things which could have been converted by his allegedly unauthorized trips are the aircraft and the gasoline used to fly them. The government and the district court took the view that the subject of conversion was flight time in government aircraft.[3] Consistent with this theory, the government

---

2. An act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids. To establish specific intent as the term implies, the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law.

An act is done knowingly if done voluntarily. The purpose of adding the word "knowingly" is to insure that no one would be convicted for an act done because of mistake, accident, or other innocent reason.

3. May also argues that there is a fatal variance between the allegations of the indictment and

the government's proof at trial. The indictment alleged that May converted to his own use "property and other things of value * * to-wit: [a description of the particular aircraft used] and the aviation fuel required to operate it between [the terminals of the particular flights]." May contends that this indictment did not give him fair notice that he would be tried for converting the *use* of the airplane. We disagree. The indictment was clearly sufficient to inform May of the government's accusation so as to enable him to prepare his defense. *See Spratlin v. Solem*, 577 F.2d 56, 59 (8th Cir. 1978).

introduced evidence of the cost per hour of operation for each airplane, which included the salaries of the pilots and the mechanics who serviced the planes.[4]

May, relying primarily on *Chappell v. United States,* 270 F.2d 274 (9th Cir. 1959), argues that any evidence as to the value of intangibles, specifically the salaries of servicemen, was impermissible. In *Chappell,* the Court reversed, on its own motion, the conviction of a defendant charged with having converted to his own use "the services and labor of * * * an airman in the United States Air Force" by causing the airman during duty hours to paint three private apartments belonging to the defendant. *Id.* at 275. Reasoning that conversion, like stealing, larceny and their kindred crimes, was limited in subject to tangible chattels, it specifically disapproved *Burnett v. United States,* 222 F.2d 426 (6th Cir. 1955), in which the Sixth Circuit, without discussing the issue, affirmed a conviction for the conversion of services. "Such offenses were never thought to be committed by one man making use of the services of another's servant without reimbursing the master." *Chappell v. United States, supra,* 270 F.2d at 276.

The government argues that *Chappell* has been discredited and is no longer good law. In particular, it relies on *United States v. DiGilio,* 538 F.2d 972 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), and *United States v. Lambert,* 446 F.Supp. 890 (D.Conn.1978), *aff'd sub nom United States v. Girard,* 601 F.2d 69 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). These cases endorse the position that the statutory words "thing of value," broaden the scope of section 641 beyond the subject matter of the common law torts which are its foundation.[5] The Second Circuit set forth this argument last year in *Girard*:

[W]e are impressed by Congress' repeated use of the phrase "thing of value" in section 641 and its predecessors. These words are found in so many criminal statutes throughout the United States that they have in a sense become words of art. *The word "thing" notwithstanding, the phrase is generally construed to cover intangibles as well as tangibles.* For example, amusement is held to be a thing of value under gambling statutes. Sexual intercourse, or the promise of sexual intercourse, is a thing of value under a bribery statute. So also are a promise to reinstate an employee, and an agreement not to run in a primary election[.] The testimony of a witness is a thing of value under 18 U.S.C. § 876, which prohibits threats made through the mails with the intent to extort money or any other "thing of value."

*Id.* at 71 (emphasis added, citations omitted).

Further, these cases hold that their broad interpretation of section 641 is in harmony with the Supreme Court's discussion of the statute's purpose: "The history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *United States v. DiGilio, supra,* 538 F.2d at 978; *United States v. Lambert, supra,* 446 F.Supp. at 893 (both quoting *Morissette v. United States, supra,* 342 U.S. at 266 n.28, 72 S.Ct. at 251 n.28).

We agree with the views of the *DiGilio* and *Girard* courts and hold that "valuables" not ordinarily subject to tort conversion may nevertheless be subject to criminal conversion under section 641. It is

4. Two types of planes were involved in these flights, the F100F and the U–3A. The operating cost per hour for each of these planes was introduced into evidence. Since the estimate for the U–3A flights did not include the salaries of the pilots, additional evidence as to the actual salary expenses of the pilots of the U–3A flights was introduced when known.

5. *But see United States v. Hubbard,* 474 F.Supp. 64, 79 (D.D.C.1979) ("If the actions do not constitute the tort of conversion, the same actions should not constitute the federal crime of conversion in the absence of some clearer indication of Congressional intent to change the law.").

clear that the "thing of value" which was involved in these flights was the flight time itself. May would have us limit the proof of the value of that flight time to proof of the value of gasoline, the only "tangible" involved. To do so would ignore other readily ascertainable and quantifiable components of the operational costs of these airplanes merely because they relate, in the main, to services rather than chattels. The evidence of the value of those services, which is part of the value of the questioned flight time, was properly admitted and before the jury.

■ May's final contention with respect to the flight counts is that the district court erred by failing to instruct the jury that conversion requires a serious violation of the owner's right to control the use of its property. May's theory is that since the flights partially satisfied the training and flight time requirements of the National Guard pilots who flew them, the government's right to use its airplane and gasoline was not seriously violated.

Consistent with this theory, May requested a jury instruction emphasizing the seriousness of the violation.[6] The district court denied this instruction as inconsistent with what it believed to be a better theory of conversion.[7] Its conversion instruction focused on two things: first, whether May's use of the airplanes was unauthorized; and second, whether the government's benefits from the flights were merely incidental to May's benefits. We think that the instruction was in error.

The touchstone of conversion is the exercise of such control over property that serious interference with the rights of the owner result, making it just that the actor pay the owner the full value of the object. Restatement (Second) of Torts § 222A. Section 228 of the Restatement (Second) deals explicitly with conduct which exceeds authorized use.

> One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby *seriously violated*. (Emphasis added.)

The problem with the district court's instruction is that it assumes that any misuse or unauthorized use of property is a conversion. Indeed, the first paragraph of Instruction 13 originally read as follows:

> To "convert" property to one's own use means willfully to apply, or appropriate, or use, the property of another for the benefit of the wrongdoer. If property has been placed in one's custody or possession for a limited use or purpose, the *willful use of such property in an unauthorized manner or to an unauthorized extent constitutes a conversion*. A conversion may be consummated without any intent to keep the property permanently. (Emphasis added.)

After defense counsel objected, the second sentence was softened from "constitutes" to "may constitute." Even with this correction, however, the instruction misses the mark because it does not mention the requirement that the misuse constitute a serious violation of the owner's right to control the use of the property.

The district court remarked that while the theory of conversion espoused by the government and adopted in its instructions was somewhat novel, the theory was justi-

---

**6.** His requested instruction is as follows:
Use of a chattel in a manner which is a serious violation of the right of another to control its use may also amount to a conversion but only if it so seriously interferes with right of another to control the chattel as to make it just to require the Defendant to pay its full value.

**7.** We note that the requested instruction implies that only "chattels" may be the subject of conversion. As we have already discussed, the

district court properly concluded that the subject of the conversion in this case was flight time in the aircraft. Thus, the use of the term "chattel" in the requested instruction was, indeed, inconsistent with the district court's proper interpretation of the scope of conversion under section 641. The requested instruction's emphasis on the standard of "serious violation," however, was proper and consistent with the traditional meaning of conversion.

fied by *Morissette v. United States, supra,* 342 U.S. at 246, 72 S.Ct. at 240. There, in discussing criminal conversion under section 641, the Court noted that conversion reaches some actions not covered by stealing or embezzling. "Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." *Id.* at 272, 72 S.Ct. at 254. This language, however, did not, as the district court apparently assumed, equate "misuse" with "conversion." It did not undermine the need for a finding of a serious violation of the owner's right to control the use of the property.

The remaining paragraphs of the district court's conversion instruction are also troublesome:

> If the use of the property or thing of value by the wrongdoer results in benefits to both the wrongdoer and the owner, there is no conversion unless (1) the property or thing of value was used to accomplish the wrongdoer's purpose and was for his benefit; (2) the benefit to the owner was only incidental to the benefit to the wrongdoer; and (3) such incidental benefit was intended to serve as a justification for the use of the property or thing of value by the wrongdoer.

> As applied to this case, if you find beyond a reasonable doubt that the defendant was responsible for or caused the particular flight you are considering to be flown; that the reason for that flight was to transport the defendant to the destination of his choice for his personal convenience rather than an official duty; that any benefit to the government from such flight was only incidental to the defendant's purpose; and that such incidental benefit was intended to give legitimacy to that particular flight, you may then find that the government has estab-

lished the first element of the count under consideration.

▆▆▆▆▆ We are unable to find any case using this admittedly novel standard.[8] Determining whether the benefits from a use were incidental, as opposed to determining whether one use seriously violated the owner's rights of control, requires a primary focus on the intent of the actor rather than on the nature of the use. It is, of course, possible that the government's *benefits* from the flights may have been only incidental to May's purposes, but the government's right to control the *use* of the flight time may nevertheless have been complete. Indeed, this appears to have been the thrust of General May's defense. The failure to properly instruct the jury as to the meaning of conversion was, therefore, fatal to the flight count convictions.[9] The government may, of course, retry May on these counts.

## II. THE NON-FLIGHT COUNTS

▆▆▆ May's first argument regarding his conviction on Counts 13, 16, 17 and 18 is that the errors regarding the flight counts so prejudiced the jury that May was unable to receive a fair trial on the remaining counts. We disagree. The fatal error regarding the flight-count convictions was an improper jury instruction, not the admission of tainted evidence. The evidence amply supports the non-flight convictions, and there is nothing to suggest that the jury did not give each count independent consideration.

▆▆▆ May also makes specific contentions regarding each of these non-flight counts. Count 13 charged May with making a false statement in violation of 18 U.S.C. § 1001. The questioned statement was that May's trip to New Orleans was "for National Guard duties." Since it is clear that May went to New Orleans to see Ms. Applequist,

---

**8.** *See* E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* §§ 16.01 and 46.4. These may have been the source of the district court's benefit analysis.

**9.** May raised two other issues regarding the flight counts. He first contends that only Iowa can complain of the unauthorized use of the

planes because the planes were bailed to Iowa from the federal government. Second, he argues that since all of the flights were taken under competent orders, there can be no conversion. Neither of these arguments merits discussion; both are rejected.

the falsity of that statement is uncontested. May does, however, contend that the statement was not his own and that the evidence supporting that conclusion was insufficient to support his conviction.

The statement appeared in General May's orders, which were signed not by May but by his Deputy Adjutant General. The evidence, however, indicated that the orders were drawn up from information supplied by May to his Warrant Officer. The evidence was sufficient to sustain the conclusion that the statement was, in fact, that of General May and his contention to the contrary was resolved by the jury.

▪ The second false statement count (Count 16) related to a statement made by General May to an investigator from the Inspector General's office, United States Fifth Army. May allegedly told the inspector that he flew to Tampa, Florida, aboard a National Guard aircraft on a "seats available" status. Again, the falsity of the statement is uncontested. May contends, however, that the conviction must fall (1) because it was not shown that May knew the statement to be false when he made it, (2) that the statement was not material, and (3) that the statement "had no official mutually ascertainable meaning." May's theory is that the flight to Tampa was an authorized training flight arranged so that one of the pilots could visit his parents. May thus considered his own participation to be similar to a "seats available" status. Again, May's argument is factual and was decided by the jury. There was ample evidence that May knew the meaning of the term used, knew that his participation was not on a seats available status and that the statement was material because it was made in the hope of influencing the pending investigation.

Count 17 charged May with "unlawfully attempt[ing] to cause to have concealed, obliterated, or destroyed" government records in violation of 18 U.S.C. § 2071. The count concerns a call which General May made to retired Brigadier General Clinton Miller. The evidence showed that May asked General Miller to contact General Gilbert, who controlled the flight records, to see if the records of one of his flights could be made unavailable to the investigating authorities. Miller did call General Gilbert, who refused the request, and then called May back with the news.

▪ May contends, first, that "causing" an attempt is not prohibited by the statute, and, second, that the evidence failed to establish an attempt. He argues, first, that 18 U.S.C. § 2071 does not speak of "causing" or attempting to "cause" the concealment of records and, thus, no criminal conduct was alleged. The government maintains that "causing" can be read into section 2071 by application of 18 U.S.C. § 2(b) which states: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." May disputes the applicability of section 2(b) to section 2071 because the latter section, unlike some others to which section 2(b) applies, never contained any "causes or procures" language. We find the proffered distinction in the history of various acts in the criminal code to be meaningless. We think that section 2(b), like section 2(a), "is applicable to the entire criminal code." *See United States v. Rector*, 538 F.2d 223, 225 (8th Cir. 1976), *cert. denied*, 441 U.S. 963, 99 S.Ct. 2410, 60 L.Ed.2d 1068 (1979), and *Breeze v. United States*, 398 F.2d 178, 192 (10th Cir. 1968).

▪ May also argues that his Count 17 conviction must fall because his conduct constituted only a solicitation, not an attempt to commit a crime. Specifically, he contends that the evidence showed only preparation and that no overt act constituting a substantial step in the attempt was shown. We disagree. When May called General Miller, he engaged in a course of conduct designed to culminate in the unlawful concealment of government records. *See United States v. Robles*, 185 F.Supp. 82, 85 (N.D.Cal.1960). The evidence was sufficient to sustain the jury's verdict on this count.

Finally, May argues that his conviction on Count 18 should be overturned because there was insufficient evidence to establish the falsity of the claim. Count 18 charges May with submitting a false claim for payment in regard to his trip to New Orleans. May submitted a claim for full-time training duty for four days, the last of which was the day he returned from New Orleans. It is undisputed that May was not entitled to federal payment for his time in New Orleans since he had no National Guard duties there. May contends, however, that the claim was valid since he performed federal full-time training duties upon his return to Iowa that day. There was conflicting evidence on whether May performed other duties and on whether such duties would entitle him to payment. The evidence was sufficient to sustain the jury's conclusion that the payment claim was indeed false.

The convictions on Counts 1–9, 11 and 12 are reversed and remanded for new trial. The convictions on Counts 13, 16, 17 and 18 are affirmed.