UNITED STATES of America,
Appellant,

v.

James Timothy WILSON, Appellee.

No. 80–1401.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1980.

Decided Dec. 18, 1980.

Ronald S. Reed, Jr., U. S. Atty., Kansas City, Mo., for appellant.

Mark R. Singer, Overland Park, Kan., for appellee.

Before LAY, Chief Judge, and BRIGHT and McMILLIAN, Circuit Judges.

LAY, Chief Judge.

James T. Wilson was found guilty by a jury of conversion of government property in violation of 18 U.S.C. § 641. Specifically, Wilson is charged with using a government secretary to type documents for a private business venture.[1] The district court found that Wilson lacked the requisite criminal intent to steal or convert government property and granted a motion for judgment of acquittal. The United States has appealed. We affirm the judgment of acquittal.

Wilson was employed in the Kansas City Regional Office of the Department of Health, Education and Welfare (HEW), where he held the position of assistant regional director in charge of the Office of Planning & Evaluation (P & E). From 1975 until April, 1978, Irma Mullane was his secretary. In July, 1977, a reorganization of HEW was ordered. The regional Planning & Evaluation Offices were abolished effective September 30, 1977. Wilson remained on the payroll after September 30, but the P&E staff was gone and P&E had no further duties. In February, 1978, Wil-

---

1. We have recognized that misuse of federal funds and equipment and the time of federal employees may be grounds for criminal convictions. *See, e. g., United States v. Pintar*, 630 F.2d 1270 (8th Cir., 1980); *United States v.* *May*, 625 F.2d 186, 190–92 (1980); *United States v. Anderson*, 579 F.2d 455 (8th Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978).

son was appointed director of the Kansas City Office of Service Delivery Assessment (SDA). This office was similar to P&E in that it evaluated the effectiveness of HEW programs, but where P&E was directed by regional officials, the various SDA offices received their work orders from a central office in Washington, D. C. which coordinated the efforts of the regional SDAs.

In the summer and fall of 1977 Wilson began exploring the possibility of starting a business known as "The Woodworks". This business was to make working space, advice and equipment available to people working on woodworking projects. Wilson's initial task was to prepare a 176 page "business plan" discussing the prospects for a business of this nature. He concedes that his secretary, Irma Mullane, typed most of this plan and did other typing for The Woodworks during the period between the abolition of P&E and the first duties of SDA. Mullane testified that Wilson first asked her to do this work in the late summer of 1977, and that from then until her retirement in April 1978 she "worked on it pretty constant", and that "many weeks it was almost 100 percent."

After Mullane's retirement, Wilson asked secretaries Charla Phipps and Barbara Proenza to do typing for his business. Phipps apparently spent several weeks preparing a lease for business property and Proenza typed approximately 18 letters over a period of several months. These secretaries agreed the work was voluntary and did not interfere with their official duties.

An undercover investigation by a Kansas City newspaper reporter revealed Wilson's use of secretaries for his business and Wilson was charged in a six count indictment.[2] The district court dismissed Counts One and Four prior to trial. The jury convicted

Wilson of Count Five (renumbered as Count Three) for conversion of Mullane's services and acquitted him on all other counts.

*Evidence of Intent.*

■ A conviction under 18 U.S.C. § 641 requires proof of "criminal intent to steal or knowingly convert, that is, *wrongfully* to deprive another of possession of property." *Morissette v. United States,* 342 U.S. 246, 276, 72 S.Ct. 240, 256, 96 L.Ed. 288 (1952). *See also United States v. May,* 625 F.2d 186, 189 (8th Cir. 1980); *United States v. Butler,* 494 F.2d 1246, 1253–54 (10th Cir. 1974). Our inquiry here is whether the evidence showed that Wilson possessed the requisite criminal intent during the period named in the indictment, October 1977 through March 1978.

Wilson does not dispute Mullane's testimony that she performed this work beginning in the late summer of 1977. Wilson testified, however, that he told Mullane to do this work only when she had no official work and that she was not to allow this work to interfere with government work. No one contradicted this testimony. Further, Wilson insisted that when Mullane did this typing, he and Mullane had little or no government work to do because of a period of inactivity caused by the transition from P&E to SDA.

The order to abolish P&E came out in July 1977, effective September 30, 1977. From July to October the P&E employees . finished their projects and all but Wilson and Mullane left the P&E payroll. Thomas Budd, a P&E employee, said the reorganization caused P&E work to come to a standstill. After September 30, Wilson said he had no more P&E duties and had not been named to the SDA staff. Wilson's first contact with SDA occurred in January of

---

2. Count One alleged mail fraud. The alleged scheme involved diversion of government supplies, equipment and secretarial time; the mailing was a letter from Wilson discussing the lease. Count Two charged Wilson with wire fraud based upon the same scheme and the transmission of Charla Phipps' "Time & Attendance Report." Count Three alleged false statements (18 U.S.C. §§ 1001–02) based on

issuance of a Time & Attendance Report for Irma Mullane misrepresenting her work; Count Four also alleged false statements by Wilson during the initial investigation by HEW regional officials. Count Five alleged conversion of Irma Mullane's services between October 1, 1977 and March 31, 1978, and Count Six charged Wilson with conversion of a government three–ring binder.

1978 when he attended an SDA organizational meeting in Washington, D. C. Although an agenda for SDA work projects was distributed at this meeting, Wilson was not yet an SDA employee. After he attended the meeting he decided he would be interested in working with SDA and expressed this desire to Thomas Higgins, the principal regional official in Kansas City. Wilson did not receive his official appointment until February 7, 1980. He insists he had no SDA duties until March or April of 1978.[3]

Wilson acknowledged that he was told at the SDA meeting in January that he could work on regional office projects, and claimed he did some small projects for Higgins during this period. Higgins, who began his job in September 1977, agreed that Wilson did some reports to help Higgins learn about his job. Higgins also agreed that the P&E office was "on hold" until SDA projects got underway, and that there was a lag in work assignments until SDA began. Libby Halperin, the former head of SDA, agreed the transition caused a lag in work, but said that she believed Wilson had work from the regional office.

■ The United States claims that Wilson's intent is shown by his failure to report his inactivity and by testimony that he avoided opportunities to take on other work. However, Wilson claimed he told Higgins when he had nothing to do and that he made his lack of work known to Halperin. Higgins and Halperin denied that Wilson ever told them he was not busy but were not specific about the time period.[4] There was some testimony about failures to seek out or accept work, but it apparently referred to periods later than the months when Mullane did her typing. James Bergfalk, formerly Higgins' assistant, testified that Wilson declined to participate in some regional projects and that Wilson never told him about a lack of work. The record would indicate, however, that Bergfalk had to be referring to periods later than the period of this count since he did not begin his job until just before Mullane retired. Similarly, Milton Fick, a former SDA employee, claimed that files could have been worked on and that Wilson could have volunteered for other work that was pending in other regions or in the Kansas City region. However, Fick did not start working with SDA until January 1978, and his testimony refers to periods of inactivity in late spring and summer of 1978 and in July–August of 1979. Thus, there is no clear testimony identifying work that Wilson declined to do during the period in question.[5]

Finally, there was no testimony that Wilson ordered Mullane to conceal her efforts, or that Wilson concealed this work at the time it was being performed. *Cf. United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980). There is also no indication he reported his activities or the activities of his secretary during this period to anyone although later that spring Wilson informed Higgins that he was working on a private business project.

This court recently observed that "[t]he touchstone of conversion is the exercise of such control over property that serious interference with the rights of the owner result ...." *United States v. May*, 625 F.2d at 192. In order to constitute a viola-

---

**3.** The major project Mullane worked on was the business plan. It is not clear when she finished this, although Wilson implied it was finished in December when he began to pursue other aspects of the proposal. If this is correct, the bulk of Mullane's work came before Wilson had even gone to his first meeting with SDA.

**4.** In fact, Higgins implied that he knew Wilson had nothing to do during at least part of this period. He stated that "once they [SDA] started doing assessments, I don't recall them ever saying they had nothing to do. There was a period of time prior to the [SDA] operation

getting its first assessment when obviously they didn't have that much to do."

**5.** There is repeated testimony that Wilson completed the work assigned to him and that he did excellent work. The closest anyone came to claiming interference with work was Fick's testimony that the files suffered. Both Phipps and Proenza testified that they were told to do the work only if they had no government work to do, and that the work never interfered with government projects.

tion of section 641 the government must prove the defendant's criminal intent beyond a reasonable doubt; that is, that the defendant knowingly and purposely exercised control over the property in such a manner that a serious interference with the rights of the government would result. *See id.* at 190. As our discussion indicates, the agency reorganization left Wilson and his secretary with little or no assigned work during the period named in this count. Further, there is no convincing evidence that Wilson avoided work or concealed the use of his secretary for private work. Under these unique circumstances, although there may have been a breach of fiduciary duty by Wilson, we find insufficient evidence to allow a jury to find beyond a reasonable doubt that the defendant possessed criminal intent to convert or steal government property.

The United States suggests that Wilson's criminal intent is shown by several events which occurred after the period named in this count, including Wilson's continued use of secretarial time, his failure to take on other work, and alleged acts of concealment, including denying significant use of secretarial time and ordering destruction of a word processing disc containing Woodworks materials. The United States urges that the evidence of other crimes and wrongdoing is admissible to prove intent. We have no disagreement with this argument, but the fact that evidence is admissible does not mean it is sufficient to prove intent. We deal here with Wilson's state of mind during the unique circumstances caused by the reorganization. Evidence concerning later acts does not prove Wilson's intent during the period involved; the jury refused to convict him for actions in the later period. "Each count is a separate charge and a separate case and each count must stand on its own proof." *United States v. Mahanna*, 461 F.2d 1110, 1118 (8th Cir. 1972).

This case is a troublesome one. It would appear the defendant may have misused his position and violated his obligation to render loyal service to his employer, the United States Government. Nevertheless, under the circumstances presented here, the conduct was not criminal. The Government failed to present evidence sufficient for the jury to find intent to convert beyond a reasonable doubt and, therefore, we agree with the trial court that the prosecution failed to prove the requisite criminal intent.

The judgment for acquittal is affirmed.