**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Paul SCOTT, Defendant-Appellant.**

**No. 85–5175.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1986.

Decided May 13, 1986.

Pamela J. Naughton, Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Pamela J. Naughton, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Gershon D. Greenblatt, San Diego, Cal., for defendant-appellant.

Before SCHROEDER and FLETCHER, Circuit Judges, and MacBRIDE,* District Judge.

FLETCHER, Circuit Judge:

William Paul Scott appeals his conviction on six counts of unauthorized sale of government property, 18 U.S.C. § 641 (1982).[1] We affirm.

## BACKGROUND

This conviction arose out of a sting operation conducted by the FBI and the Naval Investigative Service that attempted to address the problem of missing equipment at the Marine Corps base at Camp Pendleton, California. The agents conducting the operation opened an undercover store known

---

\* Hon. Thomas J. MacBride, Senior United States District Judge for the Eastern District of California, sitting by designation.

1. "Whoever ... without authority, sells, conveys or disposes of any ... thing of value of the United States or of any department or agency thereof ... [s]hall be fined not more than $10,-000 or imprisoned not more than ten years, or both ...."

as Golden State Surplus (GSS) and advertised their willingness to purchase military equipment.

Scott was a Gunnery Sergeant at Camp Pendleton. Between September, 1983, and February, 1984, it is undisputed that he sold government property to GSS on six different occasions. He told the agents working at GSS that he needed the money for his personal use. On several of these occasions, the agents offered or Scott asked for a beer, which was provided to him. The agents commonly gave beer and soft drinks to people who sold them equipment to make them feel at home and encourage them to talk.

The trial centered on whether Scott had authority to sell gear he believed was surplus and what he did with the funds that he received from the sales. There was evidence that he was given no explicit authority to sell gear and that the sales were beyond the scope of his implied authority. Scott testified that he believed that it was within his authority to sell the excess material because he used the funds to complete a military assignment—to clean up an armory and put it in a condition to pass inspection.

It is undisputed that Scott spent a great deal of effort and some of his own money to make significant improvements to the armory. Several witnesses commented on how well he fixed it up. However, there was contradictory testimony as to when he became aware he would be working on the armory. He claims he knew as early as August, 1983, but there was evidence from which the jury could find that he did not begin planning the clean-up of the armory until November, 1983, or even as late as January, 1984, some months after the first sales were made. There was also evidence that Scott was having financial difficulties in the fall of 1983, and the jury could have inferred that he needed the sale proceeds for his own use.

After the jury returned a verdict of guilty, Scott moved for dismissal due to outrageous government conduct. He also moved for a new trial on several grounds, including the trial court's failure to give an instruction on the defense of good faith belief and improper closing argument by the prosecution. These motions were denied. Scott timely appeals.

## DISCUSSION

### I. GOOD FAITH/NO INTENT TO HARM INSTRUCTION

Scott claims the trial court erred in denying his requested instructions on good faith and lack of intent to harm the government. The availability of such defenses to the crime of selling government property without authorization is a question of law. We review *de novo*. *See United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Failure to give an instruction on the defendant's theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable. *United States v. Escobar de Bright*, 742 F.2d 1196, 1201 (9th Cir.1984).

18 U.S.C. § 641 contains a collection of crimes including embezzlement, larceny, and related offenses that do not fit into strict common law categories. *See Morissette v. United States*, 342 U.S. 246, 266–67, 269 n. 28, 72 S.Ct. 240, 251–52, 253 n. 28, 96 L.Ed. 288 (1952). "Guilty" intent is an element of each section 641 crime. *Id.* at 269 n. 28, 72 S.Ct. at 253 n. 28. The defendant "must have had knowledge of the facts, though not necessarily the law" that made his act a crime. *Id.* at 271, 72 S.Ct. at 254. No court has directly addressed how this intent requirement applies to the crime of selling government property without authorization.

The Sixth Circuit has recently interpreted *Morissette* to hold that section 641 contains "a traditional criminal intent standard for all [its] proscribed activities." *United States v. Jeter*, 775 F.2d 670, 681 (6th Cir. 1985). Thus, inadvertent, negligent or reckless action "would fail to trigger the criminal prohibitions" of the section. *Id.* While not directly addressing the issue

raised here, *Jeter* does say that "purposeful action" is not required, *id.*, and recognizes no good faith defense.

■ Scott argues that the requisite intent includes a bad purpose of some sort: bad faith or an intent to harm the government. A common sense reading of the statute suggests that he is wrong. The section prohibits unauthorized sale of government property. Logically, the requisite intent is intent to sell without authorization, and nothing more. There is no indication that unauthorized selling for a good purpose is allowed. *Cf. United States v. Powell*, 294 F.Supp. 1353, 1355 (E.D.Va. 1968) (rejecting claim that subsequent restitution or intent to return property is defense to embezzlement charge under section 641), *aff'd on other grounds*, 413 F.2d 1037 (4th Cir.1969) (per curiam). We hold that any intentional sale with knowledge of the facts that make it a crime[2] (i.e., that the sale is made without authority) is prohibited, regardless of motive. The trial court properly rejected the proposed instructions.

■ Scott relies on cases that have dealt with the specific intent required for conversion of government property, also prohibited by section 641. The offense of conversion includes the element of serious interference with another's property rights. *See United States v. May*, 625 F.2d 186, 192 (8th Cir.1980). Thus, if the defendant did not know that he was seriously interfering or that the property was another's, he does not have the requisite intent and cannot be convicted of conversion. *See, e.g., United States v. Croft*, 750 F.2d 1354, 1362–63, 1366 (7th Cir.1984); *United States v. Shackelford*, 677 F.2d 422, 425–26 (5th Cir.1982); *United States v. Wilson*, 636 F.2d 225, 228 (8th Cir.1980). Cases discussing the elements of *conversion* do not support a good faith defense for *unauthorized sale*. The two crimes are separate and distinct. *Thomas v. United States*, 249 F.2d 429, 430 (9th Cir.1957) (per curiam), *cert. denied*, 355 U.S. 936, 78 S.Ct. 421, 2 L.Ed.2d 418 (1958); *Hawkins v. United States*, 458 F.2d 1153, 1155 (5th Cir.1972). To write the elements of conversion into the crime of unauthorized sale would be to assume that Congress meant nothing at all by making them separate crimes, an assumption we refuse to make. *See California v. Tahoe Regional Planning Agency*, 766 F.2d 1308, 1314 (9th Cir.1985) ("statute should not be construed in a way that renders words or phrases superfluous"). *See also Morisette*, 342 U.S. at 271–73, 72 S.Ct. at 254–55 (section 641 designed to reach all instances of larceny-type offenses and avoid gaps and loopholes between them).[3]

## II. SUFFICIENCY OF THE EVIDENCE

■ Scott contends that there was insufficient evidence that he was not authorized to make the sales. We review the record to "determine whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." *United States v. Douglass*, 780 F.2d 1472, 1476 (9th Cir. 1986).

We find sufficient evidence from which the jury could conclude that Scott did not have authority to sell the property. The FBI agent who worked on the case, an ex-Marine, testified that a Marine cannot go out and sell property just because it is excess. A Marine Corps supply officer testified that Naval Regulations forbid the sale of Marine Corps or government property and that the correct procedure for

---

**2.** Section 641 does not require that the defendant know the property belongs to the government. *United States v. Howey*, 427 F.2d 1017, 1017–18 (9th Cir.1970).

**3.** Scott argues in the alternative that the government must show either that the defendant intended to exercise control interfering with the rights of the United States or believed that the government would suffer monetary loss. Again, he supports his arguments with conversion cases. *See United States v. Collins*, 464 F.2d 1163 (9th Cir.1972); *Wilson*, 636 F.2d 225; *May*, 625 F.2d 186. Because, as noted, serious interference with property rights is an element of conversion, these defenses are germane to that crime, not to unauthorized sale.

dealing with most excess property was to turn it in to the supply officer. Scott's commanding officer testified that rope sold by Scott to GSS is normally not sold, but reused by the Marines, and that it should not be given away, even to other units. He specifically stated that Scott would not have been authorized to sell surplus gear, as such sale would be illegal. The officer also stated that if he had known Scott was selling gear to pay for improvements at the armory, he "would have relieved him of his duties and attempted to process him for court martial." Other officers testified that they had not given Scott authority to sell the property and did not know that he had been so authorized.

In addition to the direct evidence of lack of authority, there was circumstantial evidence that Scott might have been using the money acquired from the sales to pay for home improvements or to pay off his own debts. Scott, himself, told that story to the agents operating the surplus store. If Scott was using the money for private purposes, obviously the sales were unauthorized.

## III. ABILITY TO PRESENT DEFENSE

Scott claims he was denied his due process right to present his defense. *See Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). He claims this was accomplished by placing limits on the amount of time he spent testifying and by the prosecution suppressing photographs.

### A. *Time Limitation*

■ The judge was anxious to complete the trial, and did set a time limit on Scott's testimony. However, defense counsel made no objection at the time, and made no offer of proof as to additional testimony that he would have presented. The most significant limitation was placed on the prosecution, which was given only about one hour to cross-examine Scott.

Scott argues that the limitation prevented him from giving a thorough presentation of the armory improvements. Yet the record reveals that the jury received a full picture of the improvements. Any further testimony would have been cumulative. Normally a trial judge's decision to exclude cumulative evidence is reviewed for abuse of discretion. *See United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 823 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). Although the district court did not rule explicitly that any further testimony on this topic would have been cumulative, it is clear from the record that such was the case. We review to ensure that there was no denial of a fair trial resulting from the time limitation. We conclude there was no violation of Scott's due process rights.

### B. *Suppression of Photographs*

■ The second prong of this claim stems from some missing photographs of the armory improvements. During the last day of testimony, when Scott was on the stand, the photographs, which had been in the possession of the prosecution, disappeared. Scott was unable to use them to testify. The photographs reappeared at the end of the day, and were put into evidence with the rest of the exhibits. The prosecutor aggravated this problem by arguing to the jury that Scott had not shown the pictures to other witnesses.

Although there is no evidence that the photographs were deliberately suppressed, the situation is analogous to a *Brady* claim, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where the prosecution deliberately does not disclose exculpatory evidence. When a defendant requests material and it is not produced, reversal is required only if the material would tend to exculpate the defendant or reduce his penalty. *United States v. Dupuy,* 760 F.2d 1492, 1501 n. 3 (9th Cir.1985). In this case, the jury saw the photographs. The only thing lacking was the defendant's own explanation of the pictures. Yet the defendant and others had described the armory improvements in great detail. It is difficult to believe further explanation would have had any effect on the verdict,

especially since the jury got to look at the pictures anyway. Moreover, Scott's counsel made no attempt to renew his examination once the pictures were found. *Cf. United States v. Bell*, 742 F.2d 509 (9th Cir.1984) (no reversal for negligent failure to disclose *Brady* materials where defense counsel aware of materials yet did not move for continuance to obtain them). Scott's right to present a defense was not infringed.

## IV. IMPROPER ARGUMENT

██ Scott argues that the trial judge erred in not granting a mistrial after the following argument by the prosecutor:

> Prosecutor: ... And how does the law deal with that? How does justice deal with that, breaking the law for a good motive? This is even if you believe his story about the improvements. But lets say you do for a minute. How do you justify your duty in finding those elements and how do you find him guilty with maybe a good motive? Well, that's not your job. So that's an easy one. That's the Judge's job. Your job is simply to be judges of fact and to conclude that all of these elements are met or conclude they are not met. That's it. You are not to allow sympathy, or prejudice, or passion, or any kind of preconceptions to judge (sic) your judgement (sic) on the facts.
>
> Also, the Judge will instruct you are not to consider whatever punishment the defendant might receive if you find him guilty. And this is an important instruction, because I know as jurors you worry about that. *I mean are we sending this kid away for life if we convict him.*
>
> Defense Counsel: Objection. That's an improper argument, your honor.
>
> The Court: Overruled.
>
> Prosecutor: That's a proper consideration for jurors. It's a human consideration. Ladies and gentlemen, it's Judge Keep's job. That's what she gets paid

for. She has heard all of the evidence that you have heard—

> Defense Counsel: Objection. Improper argument, your honor, refers to punishment.
>
> The Court: Overruled.
>
> Prosecutor: Ladies and Gentlemen, it's Judge Keep's job. That is what she gets paid for. She has heard all of the evidence that you have ... (emphasis by Scott).

Scott claims this was an appeal to the passions and prejudices of the jury. *See Viereck v. United States*, 318 U.S. 236, 247–48, 63 S.Ct. 561, 566, 87 L.Ed.2d 734 (1943).

This argument was not error. The prosecutor was merely relaying information that would later be included in the jury instructions.[4] During closing argument, counsel are entitled to argue to the jury the law that will be encompassed in the instructions. *United States v. Sawyer*, 443 F.2d 712, 713–14 (D.C.Cir.1971). *See United States v. Companion*, 508 F.2d 1021, 1022 (9th Cir.1974) (per curiam).

## V. GOVERNMENT MISCONDUCT

██ Scott's final claim is that the agents' supplying him with beer constituted government misconduct sufficient to warrant dismissal of the charges. We have noted that there might be a due process violation sufficient to require dismissal if government conduct in investigating crime "is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Bagnariol*, 665 F.2d 877, 882 (9th Cir.1981), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982) (quoting *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). *Accord, United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir.) (per curiam), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980). *See United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).

---

4. In his motion for mistrial, Scott claimed that this argument stated "in effect that the jurors could disregard defendant's testimony as to his intent because it did not amount to a legal defense and because the trial judge could be relied upon to consider defendant's 'excuse' when imposing sentence." Because the trial judge correctly ruled that no good faith defense was available, this would have been a proper line of argument.

The basis of Scott's claim is that he had had some previous problems with alcohol, and therefore the government should not have given him beer. There is no evidence that Scott was an alcoholic or that the agents knew or had any reason to know of his previous problems with alcohol. There is also no evidence that he was drunk when he was at GSS. There was evidence that he had *asked* for a beer on at least one occasion.

Scott suggests that the agents had a duty to check the records to discover that he had had counseling for alcohol-related problems. He also suggests that the use of alcoholic beverages in the sting operation disrupted his "capacity to resist." There is no evidence to suggest Scott was not ready to sell at all times, however. In any event, the government's actions do not come close to meeting the strict test for government misconduct that we have enunciated.

AFFIRMED.