UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 96-3970; 3971

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| Appellee | * |
| | * |
| v. | * |
| | * Appeal from the United |
| RICHARD SOBRILSKI, MARTIN | * States District Court for CHRISTINA |
| | * the Western District of |
| | * Missouri |
| Appellants. | * |

Submitted: May 20, 1997

Filed: October 9, 1997

Before BEAM, FRIEDMAN*, and LOKEN, Circuit Judges.

FRIEDMAN, Circuit Judge.

In this consolidated appeal, the appellants Richard Sobrilski and Christina Martin challenge on various grounds their convictions for conspiracy to distribute and possess methamphetamine and amphetamine, and for an attempt to distribute amphetamine, and their sentences. We reject all of the appellants' contentions and affirm their convictions and sentences.

I.

A.     The jury could have found the following facts:

_____

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

In October 1988, Sergeant Bickers, an undercover officer of the Missouri State Highway Patrol, posing as a drug dealer, purchased one ounce of amphetamine from Bobby Ellison for $1500. Ellison had obtained some of the substance from the appellant Sobrilski, with whom he shared his profits. Sergeant Bickers thereafter had numerous telephone conversations with Ellison regarding drug transactions. During one conversation, Ellison told Sergeant Bickers that if he needed to buy drugs when Ellison was unavailable, he should contact J.D. Richey or Patty Lowe (Ellison's girlfriend and later wife).

On November 22, 1988, Sergeant Bickers went to Ellison's home to purchase drugs. There he met Richey, who explained that Ellison was away because he and his partner "Richard" (Sobrilski), had left for Texas to make a large drug purchase. At that time, Sergeant Bickers purchased a small quantity of amphetamine from Richey. The drugs Richey sold Sergeant Bickers were drugs that Ellison and Sobrilski had purchased on a prior trip to Texas.

During one of their telephone conversations, Ellison gave Sergeant Bickers his partner's telephone number, which was the trailer home in which Martin and Sobrilski lived. In late January 1989, Ellison introduced Sobrilski to Sergeant Bickers. The three discussed drug transactions. Sobrilski dominated the conversation, telling Sergeant Bickers that he had three drug sources, and that he could guarantee consistent amounts of drugs. No drugs were sold or purchased at that meeting, but the three discussed future transactions. After that initial meeting Sobrilski told Sergeant Bickers in a telephone conversation that "Cricket," the nickname of the appellant Martin, could be trusted with messages should he be unreachable.

Between January 31 and February 3, 1989, there were numerous telephone calls between Sergeant Bickers, Sobrilski and Martin to arrange the drug sale discussed at the initial meeting. On February 3, 1989, Sergeant Bickers went to meet

2

Sobrilski. Martin told Sergeant Bickers to call her when he arrived at the "Pub and Deli" in Golden, Missouri. Anthony Grootens, a Drug Enforcement Agency (DEA) agent and Trooper (now Corporal) Joe Crump of the Missouri Highway Traffic Patrol, accompanied Sergeant Bickers to the Pub and Deli. Sergeant Bickers telephoned Sobrilski and Sobrilski sent Russell Sartin to meet him there.

Sartin and Terry Doss met the officers at the pub. Sartin told them that Sobrilski had just returned with two people from Arkansas and a large amount of suspected drugs. Sergeant Bickers and the other officers followed Sartin to Sobrilski and Martin's trailer home, where Sergeant Bickers and Corporal Crump were introduced to Martin.

Martin, Sobrilski, Corporal Crump and Sergeant Bickers sat in the kitchen, where Sobrilski asked whether Corporal Crump worked for a law enforcement agency. He had already so asked Sergeant Bickers on an earlier occasion. Sobrilski asked Martin to bring him his "black box." Martin asked which black box, and Sobrilski replied "You know, the one with the switches on it, the bug detector." Martin brought the detector and Sobrilski checked to see if either officer was "wired." Although Corporal Crump wore a wire, he was able to turn off the transmitter for a short period to prevent Sobrilski from detecting it.

Sobrilski then showed the undercover officers a small sample of drugs that had a "100 percent hit." He asked if the officers were interested in purchasing ten pounds of the substance. They indicated that they could not purchase such a large quantity, and Sobrilski directed the officers to the bedroom of the trailer. Sobrilski left the sample of drugs on the kitchen counter.

In the bedroom, the officers saw a broken flask with white residue, and measuring scales with a small quantity of a foul-smelling white powdery substance, which Sobrilski identified as 100 percent pure "crank." "Crank" is the street name for

either amphetamine or methamphetamine. Sobrilski offered to sell a quarter of a pound to Sergeant Bickers for $8000. Sobrilski and Sergeant Bickers had already agreed on a price of $4250 for that quantity, but Sobrilski insisted that the quality of this crank warranted a higher price. Sergeant Bickers agreed to pay $8000. Sobrilski suggested to Sergeant Bickers that he dilute the crank, claiming that it was too strong and that people using such a pure form could harm themselves. Sobrilski told Sergeant Bickers that he had more of the same quality "warehoused" within 35 miles and that he could provide him with any quantity, including a pound and a half a week, on two-hours notice.

During the negotiations, Martin entered the bedroom. Sergeant Bickers asked her "opinion of the drug. She told [him] that she liked it and that it was free to her." Sergeant Bickers, Corporal Crump and Sobrilski also discussed future purchases. Sergeant Bickers paid $8000 in cash for the drugs.

When the officers were about to leave, DEA Agent Grootens, who had been waiting outside, entered the trailer and arrested Sobrilski. Sobrilski stated "You got me. I'll do whatever it takes" to gain leniency for himself and Martin. The officers arrested Martin, and found the drug sample that had been left in the kitchen in her pocket. Corporal Crump seized various drug related paraphernalia in the trailer, including part of a broken flask, a baking bowl, the black box wire detector, the scales and a revolver. About 250 yards from the trailer, the officers found behind a tree in a wooded area and seized a yellow bag containing one big chunk of the white powdery substance.

Soon after the officers had arrested Martin and Sobrilski, Ellison came to the door. Sobrilski attempted to warn him about the officers, but the officers quickly arrested Ellison. Ellison stopped at Sobrilski's home on his way back from Texas, where he had gone to acquire drugs. Ellison returned because Sobrilski had called him explaining that the trip to Texas was no longer necessary because he had found a new

4

drug source.

Immediately after his arrest, Sobrilski agreed to show the officers where he had obtained the drugs. The officers and Sobrilski drove to Arkansas. Because of bad weather, the trip lasted about five hours. At no point before, during or after the trip did Sobrilski say or do anything to indicate that he knew that the substance he sold to Sergeant Bickers was not drugs.

A couple of weeks after the arrest Sobrilski told Ellison that the police had overlooked one quarter pound of drugs in the trailer and that he intended to sell it himself to pay for lawyers. Martin told Patty Lowe that the police had overlooked "crank" in a Tupperware container in the kitchen and that she was trying to find someone to sell it to raise money for bond and attorney fees.

B.      When the government tested the white substance that Sobrilski sold to Sergeant Bickers, it turned out to be phenylacetic acid, a substance that has the same odor, appearance and ingredients as amphetamine or methamphetamine, but which is not a controlled substance. It may be produced in an unsuccessful attempt to manufacture amphetamine, which had happened here.

Roger Widner and Sam Mathus had "cooked" the drugs in late January, 1989, using Widner's laboratory equipment. They made a substance that looked like and that, they believed to be crank. Mathus took the substance to his home. The day before the arrest, Dwight George told Sobrilski that he had a significant quantity of drugs for sale. Sobrilski went to George's house, where he met Widner. The three drove to Mathus's trailer home, where Widner picked up a large bag, which they took back to Sobrilski's trailer. The bag contained a flask filled with a white powdery substance, purportedly crank.

At the trailer the three men tried to remove the substance from the flask. At Sobrilski's request, Martin brought him his "peace maker" (a firearm), a cuestick which the men used to remove the substance from the flask, and a bowl in which to put the powder. Widner and George weighed out two quarter pounds of the substance, aware that Sobrilski had already arranged to sell one quarter pound to Sergeant Bickers and expecting that he might sell a second quarter pound. Widner and George retained the rest of the substance -- a large quantity (about four to five pounds), which they "stashed . . . in the woods" and which the officers later found in the yellow bag near the trailer.

Throughout the transaction, Widner and George believed the substance in the flask to be crank and Sobrilski's actions indicated that he believed the same thing. Widner and George "fronted" the substance to Sobrilski, expecting to receive payment after he completed the sale to Sergeant Bickers.

C.      At trial, Sobrilski testified that when he sold the substance to Sergeant Bickers, he knew it was not crank because it neither smelled nor tasted like crank and did not give him the "rush" typically associated with crank. He stated that when he broke the flask to remove the quarter pound which he sold to Sergeant Bickers, the substance was wet and Sobrilski knew that crank normally is dry. Sobrilski testified that he intended to sell only a non-controlled substance, and that he would not have tried to steal the officers' money had he known they were police officers.

Martin testified that, although she took messages for Sobrilski, she was unaware that the messages were related to drugs, and that despite her relationship with Sobrilski, she remained ignorant of any drug-related activity. She denied telling Sharon See (Ellison's mother) and Patty Lowe, that "the police almost got us. I had some drugs right there in the Tupperware, and the police missed them." See and Patty Lowe testified that Martin had made such a statement.

The jury convicted Sobrilski and Martin of both counts with which they were charged: conspiring to distribute and possess methamphetamine and amphetamine (Count I) and attempting to distribute amphetamine (Count II), both in violation of 21 U.S.C. § 846. After their convictions Sobrilski and Martin failed to appear at their sentencing hearings. They remained fugitives for more than six years, until they were apprehended in 1996.

D.     The district court** sentenced Sobrilski to concurrent terms of imprisonment on each count of 188 months, and Martin to concurrent terms on each count of 78 months. In calculating their sentences, the court included in the amount of drugs attributable to each of them the 2041 grams of the substance found in the woods near the trailer. The court also increased Sobrilski's offense level by four because of his leadership role in the offense.

II

Sobrilski does not challenge the sufficiency of the evidence to support his conspiracy conviction. Martin does not dispute that the conspiracy existed; she contends, however, that the evidence does not show that she joined it. "Once the government establishes the existence of a drug conspiracy, only slight evidence linking the defendant to the conspiracy is required to prove the defendant's involvement and support the conviction." United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir. 1996). Here, there is ample evidence showing Martin's participation in the conspiracy.

Martin lived in a small trailer in which Sobrilski, her boyfriend, and later husband, conducted a substantial drug business. Witnesses testified that they discussed drug sales in her presence or within a few feet of her. Martin was present in the room when Sobrilski showed Sergeant Bickers a drug sample, and brought the "bug

---

**  The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri.

7

detector" to the room to ascertain whether the purchasers were law enforcement officers. When the officers went to the bedroom, Martin took the drug sample left in the kitchen and put it in her pocket. During the sale to Sergeant Bickers she entered the room and told him that she "liked the drug" and did not have to pay for it. These facts, and numerous others in the record, amply support the district court's denial of Martin's motion for judgment of acquittal.

United States v. Rork, 981 F.2d 314 (8th Cir 1992), upon which Martin relies to support her argument that the government failed to prove that she knowingly joined the conspiracy, does not help her. In Rork, an undercover officer and an informant arranged with Grade to purchase cocaine that evening. Later that day, when Rork came to Grade's trailer home, Grade told him to stay in the bedroom, out of the way, because he would be conducting a drug deal. When the officers came to make the purchase, Grade realized they were "wired" and asked them to leave. They refused and asked if anyone else was in the trailer. Grade told Rork to come out of the bedroom. Rork came out with a handgun, stated that there would be no drug deal that day; and told the men to leave. A jury convicted Rork of conspiracy to distribute cocaine, but the district court granted a judgment of acquittal because the government had not established that he knowingly became a part of the conspiracy.

This court affirmed, holding that "Rork's presence in the trailer, coupled with knowledge that Grade intended to sell drugs, does not establish membership in a conspiracy." Rork, 981 F.2d at 316. The court noted that "the government produced no evidence, circumstantial or otherwise, which would indicate a prior agreement between Rork and Grade . . . . Rork had not been involved in any drug sales during the existence of the conspiracy." Id.

In the present case, unlike Rork, Martin's conspiracy conviction rested upon far more than her mere "presence in the trailer coupled with knowledge that [Sobrilski]

8

intended to sell drugs." As detailed above, she played an active and significant part in the drug transactions, including taking messages for Sobrilski, picking up and placing in her pocket the drug sample left on the kitchen table, and trying to sell the drugs the police had overlooked in searching the trailer. The determination whether a person has joined a conspiracy turns on the particular facts, and Rork does not support Martin's contention involving the significantly different and stronger evidence of participation in the present conspiracy.

III

Sobrilski and Martin both challenge their convictions for attempting to distribute amphetamine, in violation of 21 U.S.C. § 846, on the ground that because what they sold to Sergeant Bickers was not a controlled substance, it was impossible for them to have committed the crime of attempted distribution of such a substance.

A.    Ordinarily, legal impossibility is a defense to a charge of attempt, but factual impossibility is not. See United States v. Oviedo, 525 F.2d 881, 883 (5th Cir. 1976). The line between the two kinds of impossibility frequently is difficult to draw.

> Legal impossibility occurs when the actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime. Factual impossibility occurs when the objective of the defendant is proscribed by the criminal law but a circumstance unknown to the actor prevents him from bringing about that objective.

Id. (citations omitted).

It is unnecessary to decide whether the impossibility here involved was legal or factual. That is because we agree with the decision of the Third Circuit in United States v. Everett, 700 F.2d 900 (3d Cir. 1983), that in enacting section 406 of the Comprehensive Drug Abuse and Prevention Control Act of 1970, now codified at 21 U.S.C. § 846 (1994), the provision under which Sobrilski and Martin were convicted, "Congress intended to eliminate the defense of impossibility." Everett, 700 F.2d at 904.

9

In <u>Everett</u>, the defendant attempted to sell a substance that he believed was phenyl-2-propanone (P-2-P), a controlled substance, but which in fact was not a controlled substance. The jury convicted Everett of attempting to distribute P-2-P, but the district court entered a judgment of acquittal based on legal impossibility, because the substance he endeavored to distribute was not a controlled substance.

The Third Circuit reversed.  After a detailed discussion of the legislative history of the provision that now is § 846, which we need not repeat here, the court concluded that this was "a statute by which Congress intended to punish attempts even when completion of the attempted crime was impossible." <u>Id</u>. at 903.  It also discerned such a Congressional intent in the "purpose" of the Drug Act "to strengthen the drug laws." <u>Id</u>. at 906-07.  The court concluded that "[i]mpossibility is therefore no defense to the charge of attempted distribution of a controlled substance under 21 U.S.C. § 846 (1976)"; and that "[t]he distribution of a non-controlled substance believed to be a controlled substance thus constitutes an attempt to distribute a controlled substance under section 846." <u>Id</u>. at 908.

Other circuits similarly have ruled that impossibility is not a defense to a charge of violating section 846.  <u>See</u> <u>United States v. Steward</u>, 16 F.3d 317, 320 (9th Cir. 1994) (upholding conviction for attempted sale of methamphetamine when defendant in fact sold only ephedrine); <u>United States v. Dominguez</u>, 992 F.2d 678, 682 (7th Cir.) ("the sale of a noncontrolled substance which the defendant subjectively believes to be a controlled substance can constitute an attempt to distribute"), <u>cert</u>. <u>denied</u> 510 U.S. 891 (1993); <u>United States v. Reeves</u>, 794 F.2d 1101, 1104 (6th Cir.) ("A reading of the Drug Abuse Act makes it apparent that Congress, in legislating against drug abuse, intended to encompass every act and activity which could lead to a proliferation of drug traffic."), <u>cert</u>. <u>denied</u>, 479 U.S. 963 (1986); <u>United States v. Pennell</u>, 737 F.2d 521, 525 (6th Cir. 1984) ("We agree . . . that Congress intended to eliminate the impossibility defense in cases prosecuted under 21 U.S.C. §§ 841(a)(1) and 846"), <u>cert</u>. <u>denied</u>, 469

U.S. 1158 (1985); United States v. Quijada, 588 F.2d 1253, 1255 (9th Cir. 1978) (refusing to distinguish between legal and factual impossibility and stating that "generally a defendant should be treated in accordance with the facts as he supposed them to be").

"Of course, the crime of attempt is not established by proving `mens rea simpliciter.' . . . [T]he government must introduce some measure of objective evidence corroborating the attempted distribution of a controlled substance." Everett, 700 F.2d at 908 (citation omitted). See United States v. Oviedo, 525 F.2d at 885. As the district court stated in an instruction which is not here challenged, "A person may be found guilty of an attempt if he or she intended to distribute amphetamine, and voluntarily and intentionally carried out some act which was a substantial step toward that distribution."

We agree with those decisions and now hold, as did the Third Circuit in Everett, that impossibility is no defense to a charge under § 846 of attempting to distribute a controlled substance and that a person may be guilty of attempting to distribute such a substance even though, had the attempt succeeded, there would have been no crime.

B.      The remaining question is whether the evidence supports the jury verdict that Sobrilski and Martin attempted to distribute a controlled substance. In deciding that issue, the evidence is viewed in the light most favorably to the government. United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995).

The government carried its burden here. The objective evidence of what occurred supports the jury's determination that Sobrilski and Martin intended to sell a controlled substance and believed that they were doing so.

11

Sobrilski negotiated to sell what he referred to as drugs, increased the previously negotiated price for what he described as pure "crank" because of its higher quality, and suggested that the buyer dilute it because otherwise people using it could harm themselves; stated that he could provide up to a pound and a half a week on two hours notice; when he was arrested stated "you got me" and offered to cooperate to secure leniency; during his five-hour automobile ride with the arresting officers to show them where he obtained the drugs, he did not tell them that the white powder he had attempted to sell to them was not amphetamine; and after his arrest he told Ellison that the police had overlooked some drugs in the trailer, which he hoped to sell to raise money for a lawyer.

The evidence showing Martin's participation in the attempt also was sufficient to show that she believed and intended that the substance they were attempting to sell was amphetamine. She told the purchaser that she liked the drug and did not have to pay for it; she retrieved the drug sample that had been left on the kitchen table; and after her arrest told Patty Lowe and Sharon See that the police had overlooked some crank in the trailer, which she intended to sell to raise bond money.

IV

Section 846 provides that a person convicted of conspiracy or attempt is subject to the same penalties as prescribed for the substantive offense to which they relate. 21 U.S.C. §846 (1995). See United States v. Finch, 16 F.3d 228, 233 (8th Cir. 1994) ("Punishment under Section 846 is the same as the punishment specified for the substantive offense that was the object of the conspiracy [or the attempt]."). Thus, the offense level for Sobrilski's and Martin's convictions for conspiracy to distribute and possess methamphetamine and amphetamine and for attempt to distribute amphetamine is that for distribution and possession of those two drugs. In determining that level, a critical inquiry is the amount of those substances involved in the offense. The offense levels for the different amounts are set forth in the Guidelines' "Drug Quantity Table" attributable to the defendant. U.S. Sentencing Guidelines Manual §

12

2D1.1 (1995).

In determining Sobrilski's and Martin's offense level, the district court attributed to them the 2041 grams of the substance found in the woods near their trailer. Because this item constituted the major portion of the total 2425 grams of cocaine equivalency (to which, under the Drug Quantity Table, the amounts of methamphetamine and amphetamine are converted), the effect of including the 2041 grams was significantly to increase their offense levels, and hence their sentences. Based on the 2041 grams and other, smaller amounts and various adjustments, the district court determined that Sobrilski's offense level was 36, with a sentencing range of 188 to 235 months, and that Martin's offense level was 28, with a sentencing range of 78 to 97 months. As noted, the court sentenced them at the bottom of the range.

Sobrilski and Martin contend that the inclusion of the 2041 grams was erroneous because they were not jointly involved in the possession or distribution of that portion of the substance.

Application note 2 to section 1B1.3 of the Guidelines, captioned "Relevant Conduct (Factors that Determine the Guideline Range)," states:

> With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.

The record supports the district court's decision to include the 2041 grams because they were "quantities . . . with which the defendants were directly involved" and were "reasonably foreseeable quantities . . . that were within the scope of the criminal activity that [t]he[y] jointly undertook."

The 2041 grams were part of the larger quantity contained in the flask that George and Widner brought back with Sobrilski to the trailer, after the three of them had picked up the flask at Mathus' house. In the presence of Sobrilski and with the aid of Martin, George and Widner removed from the flask and weighed out two quarter pounds of the substance -- the quarter pound that Sobrilski had arranged to sell to Sergeant Bickers, and a second quarter pound they hoped he might also be able to sell. They retained the rest of the substance, which they then hid in the woods near the trailer.

The entire flask of the substance, including the portion hidden in the woods, was an integral and essential part of the conspiracy and attempt to distribute methamphetamine and amphetamine. Sobrilski recognized the availability of the 2041 grams when he told Sergeant Bickers that he had more of the same quantity of drugs warehoused within 35 miles and could supply him with any quantity on two hours notice. Indeed, at the outset and after showing the undercover officers the sample in the kitchen, Sobrilski asked whether they were interested in purchasing ten pounds. If they had gone forward with a transaction of that magnitude, it would have utilized the entire contents of the flask, including the 2041 grams.

Martin's close connection with the entire illegal venture and her activities in connection with the transactions were sufficient to make the 2041 grams also attributable to her. Moreover, they also were attributable to her because she aided and abetted Sobrilski in the distribution. Section 1B1.3 of the Guidelines subjects an aider and abetter to the same penalties as the person she has aided and abetted. "The elements of aiding and abetting are (1) that the defendant associated himself with the unlawful venture; (2) that he participated in it as something he wished to bring about; and (3) that he sought by his actions to make it succeed." United States v. Lanier, 838 F.2d 281, 284 (8th Cir. 1988) (citation omitted). Martin satisfies each of those elements.

"Defendants who challenge the sentencing court's determination of drug quantity face an uphill battle on appeal because we will reverse a determination of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made."  United States v. Sales, 25 F.3d 709, 711 (8th Cir. 1994).  The record here does not show that the district court made a mistake in including the 2041 grams in determining Sobrilski's and Martin's sentences.

V.

Sections 3B1.1(a) and (b) of the Guidelines provide that "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," his offense level should be increased by four, and that if the defendant "was a manager or supervisor (but not an organizer or leader) and the  criminal activity involved  five or more participants," his offense level should be increased by three. U.S. Sentencing Guidelines Manual § 3B1.1 (1995).

The district court increased Sobrilski's offense level by four based on its determination that "the government proved that there were at least six individuals who Mr. Sobrilski supervised. So the four-point enhancement for adjustment for the role in the offense which the pre-sentence report recommended will be granted or is correct."  The presentence report stated that "[a]ccording to the Assistant United States Attorney, Sobrilski is seen as being the leader in this offense which involved at least six people.  Pursuant to Section 3B1.1(a) of the guidelines, the offense level is increased by four levels."  In his objections to the presentence report and at the sentencing hearing, Sobrilski argued that there was no testimony or factual basis in the presentence report indicating that he was "a leader."

Sobrilski challenges the four-level enhancement on the ground that the record does not show that Sobrilski was a supervisor (or a leader) of six people involved in the criminal activity. The district court's determination of a defendant's role in the offense

is reviewed for clear error.  <u>United States v. Scott</u>, 91 F.3d 1058, 1063 (8th Cir. 1996).  There is no need to discuss the evidence underlying that determination.  Suffice it to say that the record supports the district court's determination that the criminal enterprise here involved six participants (under Section 3B1.1(a), it need involve only five persons for the enhancement to apply).

The only problem is that the district court appeared to indicate that its four level enhancement was granted because there were at least six persons whom Sobrilski "supervised." Under the guidelines, a "supervisor" receives only a three level, and not a four level, enhancement.

We could, of course, remand the case for the district court further to explain the basis for its four level enhancement.  Cf. <u>United States v. Wacker</u>, 72 F.3d 1453, 1477 (10th Cir. 1995), <u>cert.</u> <u>denied</u>, 117 S. Ct. 136 (1996); <u>see</u> <u>also</u> <u>United States v. Niven</u>, 952 F.2d 289, 291 (9th Cir. 1991) (remanding a question of offense-level when the record did not clarify upon which finding the district court based an enhancement).  Considering all the circumstances, however, we conclude that the district court's reference to Sobrilski's supervisory role as the basis for a four level enhancement was an inadvertent error and did not reflect the mistaken view that a supervisor who supervised six persons in a criminal enterprise should be given a four level enhancement.

The presentence report, which the district court followed on this issue, recommended a four level enhancement under section 3B1.1(a) because Sobrilski was a "leader" of the criminal enterprise that involved at least six people.  At the sentencing hearing, Sobrilski objected to the recommendation on the ground that there was no evidence that he was a leader.  Although Sobrilski denied that he supervised anyone, he made that argument in challenging the statement that the enterprise involved at least six people.  In this context, we think that what the district court meant to say was

that Sobrilski was a leader who supervised six persons.  Since the record supports that determination, the four level enhancement of Sobrilski's offense level stands.

The convictions and sentences are affirmed.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT