# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1405
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Timothy Conrad Rehak, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 09-1406

_____

Appeals from the United States
District Court for the
District of Minnesota.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Mark Paul Naylon, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted:  November 18, 2009
Filed:  December 22, 2009

_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

After a jury trial in district court,[1] Timothy Conrad Rehak and Mark Paul Naylon were convicted of conspiring to violate civil rights under 18 U.S.C. § 241, and theft of government property under 18 U.S.C. § 641. They appeal. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

## I.

In 2004, Timothy Rehak, a law enforcement officer, and Mark Naylon, a public information officer, were working for the Special Investigations Unit of the Ramsey County Sheriff's Office (RCSO). In September, the FBI began investigating Rehak for corruption. On November 3, it conducted an "integrity test."

The FBI rented a room at the Kelly Inn under the (fictitious) name of Vincent Pelligatti, placing $13,500 in cash in a duffel bag there. The FBI instructed a cooperating individual to tell Rehak that a drug trafficker named "Vinnie" had been arrested in Wisconsin and was trying to recover drugs and money he left in room 503 at the hotel. Rehak replied that he would try to "scarf" the money and drugs out of the hotel room.

Rehak called Naylon. At about 1:15 p.m., Rehak arrived at the hotel; Naylon arrived a few minutes later. They asked the front-desk clerk to let them in to room 503; she refused because they did not have a search warrant. Rehak and Naylon contacted Rolland Martinez, a Special Investigations sergeant, told him they had received information of narcotics and cash in the hotel room, and asked him to get a search warrant. When Sergeant Martinez arrived at the hotel to investigate, he found

---

[1] The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

Naylon upset with the desk clerk. After gathering more facts, Sergeant Martinez left to obtain a state search warrant.

At 3:38 p.m., Rehak, Naylon, and Sergeant Martinez entered room 503. According to the FBI's video recording, Sergeant Martinez begins searching the bathroom while Rehak and Naylon search the main room. In the dresser, Rehak finds the duffel bag with the $13,500. While Sergeant Martinez is in the bathroom, Naylon motions for Rehak to give him some of the cash. Rehak hands Naylon $6,000, which he puts in his coat pocket. As Sergeant Martinez returns to the main room, Rehak purports to begin searching the bag and pulls out the remaining $7,500. Sergeant Martinez is unaware that Rehak had given $6,000 to Naylon. Naylon leaves the hotel room, goes to the trunk of his vehicle, and then returns to the room.

As part of the procedure for inventorying seized property, Sergeant Martinez and Rehak separately counted the $7,500 remaining in the bag. During this procedure, neither Rehak nor Naylon told Sergeant Martinez of the missing $6,000, which was not included in the count.

At 4:19 p.m., Rehak and Naylon spoke outside the hotel room; Rehak left in his car. A few minutes later, a deputy arrived with his drug dog. The deputy and Naylon entered the hotel room. The dog sniffed the $7,500. Naylon did not tell the deputy about the additional $6,000. In his report, the deputy stated that $7,500 was seized. Sergeant Martinez completed a search warrant receipt, reporting only $7,500. Naylon reviewed the completed (inaccurate) receipt. A copy of this receipt was left in the hotel room to indicate what had been seized. As the inventory officer, Sergeant Martinez took control of the $7,500 and deposited it at the Special Investigations Unit. After the local officers left the hotel room, FBI agents entered, confirming that all $13,500 was gone.

That evening, according to Minnesota Bureau of Criminal Apprehension records, at 5:30 p.m. and again at 9:45 p.m., law enforcement databases were searched by RCSO clerks for "Vincent Pelligatti," the fictitious drug trafficker. No records were found for him. Sergeant Martinez and the drug-dog deputy testified at trial that they did not conduct any database searches for Vincent Pelligatti. The two warrant clerks who ran the searches could not recall who requested them.

Hours later, about midnight, Rehak and Naylon called Sergeant Martinez at home. Naylon said they had found an additional $6,000 in the hotel room under the mattress. The next day, Sergeant Martinez obtained the $6,000 and amended his report to reflect the full $13,500. Rehak completed a report that omitted where the $6,000 had been found and how it had been handled. When Sergeant Martinez asked him to add these details, Rehak replied he knew how to write a report and never made the requested changes.

One month later, the FBI asked the St. Paul Police Department (SPPD) to obtain the police reports of the Kelly Inn search. An SPPD supervisor asked the RCSO for reports from search warrants executed at hotels, including the Kelly Inn. After specifically inquiring about a search warrant in November at the Kelly Inn, a RCSO records person said there was no record of the search. The SPPD supervisor reiterated the request. Rehak called back that day, saying he had not yet completed the report of the Kelly Inn search. Later that day, Rehak sent the report, which lacked the section explaining where the money was found.

Nine months after this first integrity test, the FBI conducted another test. The cooperating individual again contacted Rehak, saying that a drug trafficker had left drugs and money in a vehicle. FBI agents observed Rehak and Naylon watching the vehicle, but not entering it that day. Two days later, at 2:30 p.m., the cooperating individual again contacted Rehak, saying the vehicle had been moved. At 3:00 p.m., the FBI observed Naylon conducting surveillance on the vehicle. At 5:30 p.m., Rehak

and Naylon called in a canine unit to sniff inside the vehicle; the dog did not alert for drugs.

At 8:40 p.m., Rehak called the cooperating individual and asked, "Why would anybody store a substantial amount of dope in a stolen car parked at a hotel?" The cooperating individual assured Rehak that drugs and money were there. At 10:00 p.m., with no other officers present, Rehak and Naylon entered the vehicle (where the FBI had placed video and audio recording devices). They found a bag in the trunk containing cash but no drugs. Immediately reacting that it was "odd" to find money but no drugs, Naylon stated, "Another f**kin' setup." Rehak said, "They're f**kin' probably watchin' us." They walked a short distance away from the car, talking briefly. Returning to the car, they discussed how to report the incident and whether to admit they had been in the car. They called another deputy to tow it. Rehak said he would write a report for the incident, but he never did.

Rehak and Naylon were charged with six counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; one count of conspiring to violate civil rights, in violation of 18 U.S.C. § 241; and one count of theft of government property, in violation of 18 U.S.C. § 641. The jury acquitted on the wire fraud counts. It convicted both men of conspiring to violate civil rights, and theft of government property. The jury apparently did not believe Rehak's testimony that their intent was to play a practical joke on Sergeant Martinez. Instead, the verdicts adopted the government's theory of the case: Rehak and Naylon intended to steal the money, but later changed their minds and decided to return it.

## II.

Defendants contend that there is insufficient evidence to support their convictions for conspiring to violate civil rights because they did not actually violate the civil rights of a real person. "In reviewing the sufficiency of the evidence, 'we

view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict.'" ***United States v. Blazek***, 431 F.3d 1104, 1107 (8th Cir. 2005), *quoting **United States v. Gaona-Lopez***, 408 F.3d 500, 504 (8th Cir. 2005).

It is a crime for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." **18 U.S.C. § 241**. Rehak and Naylon were convicted based on their agreement to take Vincent Pelligatti's money in violation of his due process rights. Defendants argue that this fictitious person did not have rights, so they could not have conspired to violate them.

"Factual impossibility occurs when the objective of the defendant is proscribed by the criminal law but a circumstance unknown to the actor prevents him from bringing about that objective." ***United States v. Sobrilski***, 127 F.3d 669, 674 (8th Cir. 1997). "'Factual impossibility is not a defense to an inchoate offense' such as conspiracy or attempt." ***United States v. Joiner***, 418 F.3d 863, 869 (8th Cir. 2005), *quoting **United States v. Fleming***, 215 F.3d 930, 936 (9th Cir. 2000). "[T]he crime of conspiracy is complete on the agreement to violate the law implemented by one or more overt acts, however innocent such act standing alone may be, and it is not dependent on the success or failure of the planned scheme." ***United States v. Littlefield***, 594 F.2d 682, 684 (8th Cir. 1979). *See also **United States v. Jannotti***, 673 F.2d 578, 591 (3d Cir.) (en banc) (upholding Hobbs Act conspiracy convictions for receiving money to influence official conduct from undercover agents posing as foreign business executives seeking favorable government action), *cert. denied*, 457 U.S. 1106 (1982); ***United States v. Parker***, 165 F. Supp. 2d 431, 456 (W.D.N.Y. 2001) (defendants convicted under 18 U.S.C. § 241 for conspiring to violate rights of a fictitious drug dealer, who was actually an undercover agent), *aff'd sub nom. **United States v. Ferby***, 108 Fed. Appx. 676, 680 (2d Cir. 2004) (unpublished).

In this case, the objective of defendants was to take the money of a drug trafficker, Vincent Pelligatti. Their goal, to keep his money as their own, violates the law. *See* **United States v. McClean**, 528 F.2d 1250, 1255 (2d Cir. 1976) (stating that police officers who convert to private purposes funds lawfully seized from suspected criminals violate those criminals' civil rights). The fact that Pelligatti was fictitious was unknown to Rehak and Naylon. This circumstance prevented them from actually violating a person's due process rights. While it was factually impossible to violate his rights, defendants were charged and convicted of *conspiring* to violate his rights. The crime was committed upon their agreement to steal his money. That they were unsuccessful is irrelevant to their culpability for conspiring.

The jury heard ample evidence that Rehak and Naylon conspired to take the money in violation of Pelligatti's due process rights: (1) a cooperating individual called Rehak to tell him a drug dealer named "Vinnie" had left money and drugs in a hotel room; (2) Rehak told the cooperating individual he would try to "scarf" the money and drugs from the hotel room; (3) Rehak and Naylon went to the hotel and tried to gain access without a search warrant, even though Rehak knew they needed a search warrant to enter the room; (4) Rehak found the money and handed $6,000 of it to Naylon, who pocketed it; (5) they allowed the other officers to believe only $7,500 was found; (6) Rehak falsified the search warrant return and his report of the incident; (7) even after returning the money, Rehak and Naylon never told anyone about how or where it was actually found, or that they were playing a joke on Sergeant Martinez; and (8) they recognized the second FBI integrity test as "another setup." The evidence was sufficient for a reasonable jury to find that Rehak and Naylon agreed to take Pelligatti's money in violation of his due process rights.

### III.

Defendants suggest they did not conspire to violate Pelligatti's rights, because if the facts were as they believed, the money was drug money subject to forfeiture.

Even if defendants believed the money was forfeitable, agreeing to convert it to personal use, rather than following forfeiture procedures, is sufficient for conviction under 18 U.S.C. § 241. *See McClean*, 528 F.2d at 1255-56. Alternatively, defendants argue that they believed Pelligatti abandoned his money and therefore had no rights to it. This argument is contrary to the jury's finding that defendants conspired to steal money from an "owner."

Next, Rehak and Naylon claim that they cannot be convicted unless prior case law gave them "fair warning" that their conduct violated a federal civil right. *See United States v. Lanier*, 520 U.S. 259, 267-68 (1997). Relying on Fourth Amendment search-and-seizure cases, defendants argue that since they had a search warrant, the search of the hotel room and the seizure of the money were lawful, and their subjective motivations are irrelevant, citing *Whren v. United States*, 517 U.S. 806, 813 (1996). To the contrary, the indictment here charged a conspiracy to deprive property without due process of law. In this case, subjective motivations are relevant to prove the intent to deprive property without due process of law under 18 U.S.C. § 241.

## IV.

Defendants also assert that the district court erred in its instructions to the jury. This court reviews a district court's jury instructions for an abuse of discretion. *United States v. Turner*, 189 F.3d 712, 721 (8th Cir. 1999). "In reviewing challenges to jury instructions, this Court recognizes that the district court has wide discretion in formulating the instructions, and we will affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." *Blazek*, 431 F.3d at 1109.

**A.**

Defendants contend the district court erred in failing to define "due process" for the jury. The court instructed the jury that defendants must have reached "an understanding to injure a person in Minnesota in the enjoyment of his civil rights." The court further stated that to agree to injure a person in the enjoyment of his civil rights, the defendants must have agreed to steal "property and thereby depriv[e] its owner of property without due process of law." Defendants counter that the jury should have been instructed that a taking "is not a deprivation of due process . . . if there is what is called a post-deprivation remedy available."

Defendants cite no authority that a *criminal* violation under section 241 cannot occur if the state provides a post-deprivation remedy. The cases defendants cite hold that a plaintiff in a section 1983 action cannot recover for the loss of property by state employees if the state provides an adequate remedy for the loss. *See Parratt v. Taylor*, 451 U.S. 527 (1980), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 329 (1986); *Hudson v. Palmer*, 468 U.S. 517 (1984). These cases are inapposite here, where the focus is on the defendants' agreement, not the victim's damages. Defendants' proposed instruction misstates the law.

Defendants also state that the district court erred in failing to instruct the jury that if it found that defendants' conduct did not "harm the citizens," then there was no constitutional violation. Defendants were charged with *conspiracy* to violate civil rights. The government was not required to prove they succeeded in violating the rights of others. This proposed instruction would also inaccurately state the law.

**B.**

Defendants also argue the district court erred in its instructions on the theft-of-government-property charge. The statute provides: "Whoever . . . steals . . . or

knowingly converts to his use or the use of another . . . any . . . money . . . of the United States or of any department or agency thereof . . ." shall be guilty of an offense against the United States. **18 U.S.C. § 641**.

The district court instructed the jury that:

The crime of theft of government property as charged in Count 7 has three essential elements, which are:

*One*, the defendant voluntarily, intentionally, and knowingly stole or converted money to his own use or to the use of another;

*Two*, the defendant acted with the intent to deprive the owner of the use or benefit of the money so taken; and

*Three*, the money belonged to the Untied States . . . .

With respect to the first element: To "steal" means to knowingly take something with the intent to deprive the thing's owner permanently or temporarily of the rights and benefits of ownership. To "convert" means to deliberately take or retain something with the intent to deprive the thing's owner of its use or benefit either temporarily or permanently. Property can be converted through misuse or abuse of the property as well as through its use in an unauthorized manner or to an unauthorized extent.

With respect to the second element – that is, the defendant's intent – the government need not prove that the defendant knew that the United States owned the money at the time of the taking.
. . .

Defendants argue this instruction is erroneous in two ways. First, the jury could convict even if it found that defendants intended only to take the money temporarily. They proposed the following instruction:

> If the defendant's intent was to deprive permanently, then the conversion becomes a theft. If the conversion is limited in time, and lacks the party's intent to steal permanently, then it is not a crime.

This is not the law.

> Conversion . . . may be consummated *without any intent to keep* and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use.

***Morissette v. United States***, 342 U.S. 246, 271-72 (1952) (emphasis added).

In *Morissette*, the Supreme Court recognized that section 641 intended to fill "the gaps or crevices on the law on larceny-type offenses." ***United States v. McRee***, 7 F.3d 976, 982 (11th Cir. 1993) (en banc), *citing* ***Morissette***, 342 U.S. at 271-72, *cert. denied sub nom.* ***Hale v. United States***, 511 U.S. 1071 (1994). The statute reaches all instances where "one may obtain wrongful advantages from another's property." ***Morissette***, 342 U.S. at 271. Section 641 prohibits both permanent and temporary takings. *See, e.g.,* ***McRee***, 7 F.3d at 980; ***United States v. Howard***, 30 F.3d 871, 875 (7th Cir. 1994); ***United States v. Sparkman***, 112 Fed. Appx. 358, 360 (5th Cir. 2004) (unpublished) (conviction for theft of government funds did not require proof defendant intended to permanently deprive the government of funds). The district court's instruction fairly stated the law by including temporary takings.[2]

---

[2] Defendants cite *United States v. May*, 625 F.2d 186, 192-93 (8th Cir. 1980), where this court held that a conviction under section 641 requires a serious violation of the owner's right to the property. At trial, defendants did not cite *May*, nor request an instruction requiring the jury to find a "serious violation." Here, there was no plain error because the court's instruction, following *Morissette*, required a serious violation by telling the jury that it must find defendants "acted with the intent to deprive the owner of the use or benefit of the money so taken."

-11-

Finally, Defendants argue that the district court committed plain error, Fed. R. Crim. P. 52(b), by instructing that "the government need not prove that the defendant knew that the United States owned the money at the time of the wrongful taking." "Under plain error review, 'there must be (1) error, (2) that is plain, and (3) that affects substantial rights.'" *United States v. Vincent*, 575 F.3d 820, 825 (8th Cir. 2009), *quoting* *United States v. Keller*, 413 F.3d 706, 710 (8th Cir. 2005). Here, there was no error because the government need not allege or prove that the defendants knew the property was the property of the United States. *See United States v. Denmon*, 483 F.2d 1093, 1095 (8th Cir. 1973).

Defendants contend the Supreme Court's recent decision in *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009), effectively overrules *Denmon*. In *Flores-Figueroa*, the Supreme Court interpreted 18 U.S.C. § 1028A:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

The Court stated that as "a matter of ordinary English grammar," the word "knowingly" must apply to "all the subsequently listed elements of the crime." *Flores-Figueroa*, 129 S. Ct. at 1890. Therefore, the government must prove that the defendant knew that the "means of identification" belonged to "another person." *Id.* at 1894.

Defendants would apply this construction to section 641: to be convicted, they must know the property they steal is owned by the United States. The context of section 641 defeats this interpretation. Courts have consistently held that the government is not required to prove a defendant knew the property he stole was owned by the United States because the United States' ownership merely provides the

-12-

basis for federal jurisdiction. *See United States v. Speir*, 564 F.2d 934, 938 (10th Cir.), *cert. denied*, 435 U.S. 927 (1978); *United States v. Jermendy*, 544 F.2d 640, 641 (2d Cir.), *cert. denied*, 430 U.S. 909 (1976); *United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974); *Denmon*, 483 F.2d at 1095; *United States v. Smith*, 489 F.2d 1330, 1333-34 (7th Cir.), *cert. denied*, 416 U.S. 994 (1973); *United States v. Boyd*, 446 F.2d 1267, 1274 (5th Cir. 1971); *United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970).

The *Howey* case explains:

It was not an essential part of the common law larceny-type offense that the thief knew who owned the property he took; it was enough that he knew it did not belong to him. The legislative history provides no support for an assumption that Congress intended in section 641 to add to the common law offenses a new requirement that a thief know who owned the property he was stealing.

The reason for including the requirement that the property, in fact, belongs to the Government was to state the foundation for federal jurisdiction. A defendant's knowledge of the jurisdictional fact is irrelevant, as we have held in many cases interpreting analogous statutory provisions.

*Howey*, 427 F.2d at 1018. *See also United States v. Feola*, 420 U.S. 671, 676-77 (1975) (holding that knowledge of the victim's true identity as a federal officer was unnecessary to an indictment for conspiracy to assault a federal officer, because the federal-officer element was jurisdictional); *United States v. Cox*, 577 F.3d 833, 838 (7th Cir. 2009) (in prosecution for interstate transportation of a minor for sexual activity, holding that government was not required to prove defendant knew that person transported for sex was not yet 18, stating that *Flores-Figueroa* did not apply in this context). The district court correctly instructed the jury that the government was not required to prove the defendants knew the money was owned by the United

States.  In sum, the district court's instructions fairly and adequately stated the law applicable to this case.

## V.

Defendants argue the government's indictment, and the jury's verdicts, are internally contradictory.  They claim it is impossible for them to be guilty of stealing money that was both Vincent Pelligatti's and the government's.  As discussed earlier, defendants were not charged or convicted of stealing Pelligatti's money.  They were charged and convicted of *conspiring* to do so.  By the jury's verdicts, it concluded Rehak and Naylon believed that Vincent Pelligatti left drug money in a hotel room, and they agreed to steal part of it.  Unbeknownst to them, the money belonged to the government.  The verdicts are not internally inconsistent.

## VI.

Defendant Rehak objects that the district court erred in finding he perjured himself at trial and in applying an adjustment for obstruction of justice at sentencing.  The district court's interpretation of the Sentencing Guidelines is reviewed de novo while its factual findings underlying an adjustment for obstruction of justice are reviewed for clear error and given great deference.  *United States v. Brown*, 539 F.3d 835, 839 (8th Cir. 2008).

"Under U.S.S.G. § 3C1.1 a defendant is subject to a two level enhancement if he 'testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake.'" *Id.*, *quoting United States v. Mendoza-Gonzalez,* 363 F.3d 788, 796 (8th Cir. 2004).  "When a defendant objects to an obstruction enhancement based on perjury, the district court must make findings that the defendant willfully gave false testimony concerning a material matter in the case." *Id.*

-14-

In applying the enhancement at sentencing, the court stated:

I do, however, find it more likely than not that Mr. Rehak perjured himself when he testified under oath that he did not intend to steal money from the Kelly Inn, but that he and Mr. Naylon were playing a prank on Sergeant Martinez. This testimony was, in the words of Comment 2 to Section 3C1.1, "a denial of guilt under oath that constitutes perjury." I further find that Mr. Rehak's false testimony related a material matter and was done willfully rather than out of confusion, mistake, or faulty memory. I have already described the basis for this finding, when I described the basis for my finding that Mr. Rehak and Mr. Naylon intended to permanently take the $6,000. I will therefore apply, over the defense objection, the two-level enhancement under Section 3C1.1 for obstruction of justice.

Rehak cites *United States v. Dunnigan*, 507 U.S. 87 (1993), arguing that it holds that the enhancement is precluded when the defendant's perjury relates to his intent. Rehak misreads *Dunnigan*. The Court then stated that the enhancement is not appropriate merely because a jury renders a guilty verdict and disbelieved or found inadequate a defendant's testimony. *Dunnigan*, 507 U.S. at 95. The Court held that "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same." *Id.* The district court made the proper findings in this case, which were not clearly erroneous.

## VII.

The judgments of the district court are affirmed.

———————